Kristine M. Akland
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

Andrea Zaccardi (pro hac vice pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs Center for
Biological Diversity, Yaak Valley Forest
Council, and WildEarth Guardians*

Timothy M. Bechtold
BECHTOLD LAW FIRM
P.O Box 7051
Missoula, MT 59802
(406) 721-1435
tim@bechtoldlaw.net

*Attorney for Plaintiffs Alliance for the
Wild Rockies and Native Ecosystems
Council*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ALLIANCE FOR THE WILD ROCKIES, YAAK VALLEY FOREST COUNCIL, WILDEARTH GUARDIANS, and NATIVE ECOSYSTEMS COUNCIL. | CV-<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

|  |  |
|---|---|
| Plaintiffs,<br><br>vs.<br><br>U.S. FOREST SERVICE; LEANNE MARTEN, Regional Forester of U.S. Forest Service Region 1; and CHAD BENSON, Supervisor of the Kootenai National Forest,<br><br>Defendants. |  |

## I.   INTRODUCTION

1.     The grizzly bear has been listed as threatened under the Endangered Species Act ("ESA") since 1975. Once ubiquitous across the West, grizzly bears now exist in only a few, isolated populations. The most isolated and imperiled population resides in the Cabinet-Yaak Mountains in the Kootenai National Forest in Montana. Over the last several years, the U.S. Fish and Wildlife Service ("FWS") has documented a decline in individual bears in this population and has also acknowledged that it is failing to meet every recovery target identified for the species. One of the leading causes of this dire state is the high road densities in the Kootenai National Forest. Roads are widely recognized as having the greatest and most negative impact on grizzly bears by fragmenting habitat, increasing human-caused mortality, and reducing secure habitat.

2.     The Knotty Pine timber sale Project (the "Project") threatens this declining grizzly bear population by authorizing massive clearcuts and

significantly increasing road density in an area considered crucial to grizzly bear recovery. The Project authorizes more than 5,000 acres of logging, the addition of more than 45 miles of permanent roads to the Forest system, and more than 4,700 acres of burning in occupied grizzly bear habitat on the Kootenai National Forest.

3.      The Knotty Pine Project is one of several large logging projects authorized or currently being implemented in the Kootenai National Forest as depicted below:



4.      Rather than acknowledge and address these threats, the U.S. Forest

Service ("USFS" or "Forest Service") ignored the legal requirements of the

National Environmental Policy Act ("NEPA") by failing to take a hard look at

Project's impacts on grizzly bears, violated the National Forest Management Act

("NFMA") by failing to comply with applicable Forest Plan Standards meant to

protect grizzly bears by limiting road density and conserving habitat, and violated

the Administrative Procedure Act ("APA") by making a decision that fails to consider important information regarding the Project's impacts on grizzly bears.

5.      Plaintiffs Center for Biological Diversity, Alliance for the Wild Rockies, Yaak Valley Forest Council, WildEarth Guardians, and Native Ecosystems Council hereby ask that this Court declare that Defendants violated federal law and issue injunctive relief to redress the injuries caused by these violations.

## II.      JURISDICTION

6.      This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), and 2202 (declaratory judgment and further relief).

7.      Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Rule 3.2 because Defendant Marten resides within the Missoula Division of the United States District Court for the District of Montana.

## III.      PARTIES

8.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with additional

offices throughout the country, including in Montana. The Center has more than 89,000 active members, including more than 500 members in Montana, some of which reside, recreate and have an interest in the conserving the lands and wildlife in the Kootenai National Forest. The Center and its members have a long-standing interest in conserving native species and have consistently advocated for the conservation and protection of native species, including the grizzly bear and lynx.

     9.    Plaintiff ALLIANCE FOR THE WILD ROCKIES (the "Alliance") is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion; its native plant, fish, and animal life; and its naturally functioning ecosystems. The Alliance's registered office is located in Missoula, Montana. The Alliance has more than 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Kootenai National Forest. The Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

10.    Plaintiff YAAK VALLEY FOREST COUNCIL (the "Forest Council") is a non-profit community organization working to ensure that the natural and human communities of northwest Montana are healthy and resilient. Its mission is to protect the last roadless areas in the Yaak Valley and Kootenai National Forest; maintain and restore the ecological integrity of this geographical zone by conserving habitat for native and sensitive species; encourage and support the development of local economies based on stewardship principles, value-added forest products, habitat conservation and ecological restoration; and educate local residents on the value of protected and restored landscapes for community and economic development. The Forest Council is dedicated to cultivating and encouraging meaningful dialogue between historically polarized groups by bringing them to the same table to find common ground on ecologically sound, stewardship-based forestry management practices. Forest Council members and supporters work in, use, and enjoy the Kootenai National Forest and the lands of the Knotty Pine Project area for recreation, nature study, photography, and spiritual renewal.

11.    Plaintiff WILDEARTH GUARDIANS ("Guardians") is an American West-based non-profit environmental advocacy organization dedicated to protecting and restoring wildlife, wild places, and wild rivers throughout the American West. Guardians is headquartered in Santa Fe, New Mexico, and has

offices in Missoula, Montana and throughout the western United States. WildEarth Guardians has 187,665 members and supporters, many of whom live and recreate in western Montana, including within the Knotty Pine Project area.

12.     Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Kootenai National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Kootenai National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

13.     An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Kootenai National Forest and the Knotty Pine Project area for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future. Plaintiffs' members and staff are concerned

with protecting the wildlife, scenery, air quality, and other natural values of the

Knotty Pine Project area.

14.    For example, Peter Leusch is a member of Center for Biological

Diversity and lives on private property within the Project area in the Kootenai

National Forest. He regularly visits forest stands that the Forest Service authorizes

cutting down as part of the Knotty Pine Project. He visits these areas to enjoy their

current, scenic, unspoiled, natural values, and to seek out and observe wildlife,

including grizzly bears and lynx. His ability to enjoy these areas in their natural

state and to find the wildlife he enjoys will be irreparably harmed by the Forest

Service's authorization of the Knotty Pine Project. He regularly ventures into the

Project area to enjoy the solitude and natural state of the area and will continue to

do so on a daily basis throughout summer.

15.    Rick Bass, a founding board member and current interim director of

the Yaak Valley Forest Council since its inception in the 1990s, has been camping,

hiking, hunting and gathering, and viewing wildlife in the Knotty Pine Project area

since 1987. He particularly enjoys his visits to the big stands of mature and old

cedar and hemlock and the shade they provide in the heat of summer as well as the

thermal cover in winter. One of his favorite things about the Project area is how

wet it currently is—a luxury in a time of global warming—as well as the fact that it

is one of the lowest elevations where grizzly bears are found in the continental

United States. In addition, he has visited many of the areas authorized for logging and burning in the Project area. On his many visits, he has enjoyed the area's abundant wildlife, and has viewed grizzlies, lynx, bobcat, deer, elk, wolves, marmots, mountain lions and moose. From the high peaks, he has enjoyed the scenery of areas that will become glaring arid clearcuts if the Knotty Pine Project proceeds. He returns to the Knotty Pine Project area for recreation and spiritual renewal many times each year and intends to do so for the foreseeable future. Mr. Bass's ability to enjoy his regular visits to observe the Project area's wildlife and natural scenery, and to feel the serenity of the wildlands, will be irreparably harmed by the years of logging, noise, and road construction the Knotty Pine Project authorizes, and the clearcuts, roads, destroyed habitat, and dried landscapes that logging will leave behind. He plans to continue his regular visits to the Project area throughout this summer.

16.     Adam Rissien, a member and employee of WildEarth Guardians, lives in Montana and has visited the forests within the boundary of the Knotty Pine Project area several times in the past dozen years or so. He visits the area to enjoy waterfalls and to become immersed in the sights, sounds, and smells of the wild forest, including centuries-old old-growth trees. He also enjoys seeking out the sights and signs of wildlife, including grizzly bears. Mr. Rissien has witnessed the destruction wrought by damaging logging within and around the Knotty Pine

Project area, and his ability to enjoy the forest targeted for logging, including in the vicinity of Yaak Falls Campground within the Kilbrennan Creek - Yaak River watershed, will be irreparably harmed by logging and road building the Knotty Pine Project authorizes. He plans to visit the Yaak Falls Campground, lower Yaak Falls and hike along Trail #2370 during the summer of 2022.

17.     Michael Garrity, Executive Director of Alliance for the Wild Rockies and member of Native Ecosystems Council, lives in Montana and has visited the Knotty Pine Project area in October 2016 and in the summer of 1981. He visited the area to enjoy the peace and solitude of the forest in its natural state and with the hopes of seeing grizzly bears. He plans to visit the Knotty Pine Project area again in the summer of 2024 and fall of 2026. His ability to enjoy this area will be forever damaged by the logging and road building the Knotty Pine Project authorizes.

18.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members and employees have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, NFMA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202 and 5 U.S.C. §§ 705 & 706.

11

19.     Defendant U.S. FOREST SERVICE is an agency of the United States and a division of the U.S. Department of Agriculture. The Forest Service is responsible for the management of lands and resources within the Kootenai National Forest, including those within the Knotty Pine Project area in accordance and compliance with NFMA and NEPA and other federal laws and regulations.

20.     Defendant LEANNE MARTEN is the Regional Forester of USFS Region 1 and the Forest Service official responsible for the March 24, 2022 decision rejecting Plaintiffs' objections to the Knotty Pine Project. Ms. Marten is sued in her official capacity.

21.     Defendant CHAD BENSON is the Supervisor of the Kootenai National Forest. Supervisor Benson signed the Decision Notice approving the Knotty Pine Project on March 24, 2022. Supervisor Benson is sued in his official capacity.

## IV.   LEGAL FRAMEWORK

### The Administrative Procedure Act

22.     Because NEPA and NFMA do not include a citizen suit provisions, this case is brought in part pursuant to the APA. 5 U.S.C. §§ 551-559, 701-706, 1305, 3105, 3344, 4301, 5362, and 7521.

23.     The APA allows persons and organizations to challenge final agency actions in the federal courts. *Id*. §§ 702, 704. The APA declares that a court shall

hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* § 706(2)(A).

**The National Environmental Policy Act**

24.     Congress enacted NEPA, 42 U.S.C. §§ 4321-4370h, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." *Id.* § 4321. As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. *Id*. § 4332(2)(C).

25.     To this end, the Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA. Among other things, the rules are intended to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a) (1978).

26.     To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. Where an agency is uncertain whether it must prepare an EIS, it may prepare an environmental assessment ("EA") to determine whether the action may have significant impacts and thus require preparation of an EIS. 40 C.F.R. § 1508.9.

27.     In an EA or EIS, NEPA requires that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration." *Id.* § 1502.15. NEPA also requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." CEQ, *Considering Cumulative Effects under the National Environmental Policy Act* 41 (January 1997).

28.     An EA must also identify the direct, indirect, and cumulative impacts of each reasonable alternative, including a project's ecological, aesthetic, economic, social, and health effects. 40 C.F.R. §§ 1508.7 (defining cumulative impact), 1508.8 (defining environmental effects), 1508.9(b) (requiring EAs to disclose the "environmental impacts of proposed action and alternatives"). Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b). Cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can

result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

29.    An EIS is required if substantial questions are raised whether a project may cause significant degradation of some human environmental factor.

30.    In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must consider what "significantly" means. NEPA regulations give it two components: context and intensity. 40 C.F.R. § 1508.27. Context refers to the setting in which the proposed action takes place; intensity means "the severity of the impact." *Id.*

31.    There are ten severity factors the agency must consider, 40 C.F.R. § 1508.27, and in appropriate circumstances, just one of these factors may be sufficient to require a preparation of an EIS.

**The National Forest Management Act**

32.    Through NFMA, Congress established a two-step process for managing National Forests. First, NFMA directs the USFS to prepare and implement comprehensive Land Resource Management Plans (commonly called "Forest Plans") for each national forest. 16 U.S.C. § 1604(a). Each Forest Plan (including any associated amendments) establishes management direction for resources, uses, and protective measures through standards, guidelines, goals, and

objectives for that forest. Second, the Forest Service must ensure that all site-specific projects within each forest, including but not limited to logging, road construction, and motorized use, are consistent with the relevant Forest Plan. *Id.* § 1604(i).

33.    The Kootenai National Forest's current Forest Plan was approved in 2015. The Forest Plan adopts the 2011 Amendments for Motorized Access Amendment within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendment"). The Access Amendment sets standards that apply to all future site-specific decisions regarding access management, including road construction, reconstruction, and decommissioning projects, in the Selkirk and Cabinet-Yaak grizzly bear recovery zones within the Kootenai, Lolo, and Idaho Panhandle National Forests.

34.    The Access Amendment adopted different parameters for each Bear Management Unit ("BMU") within the Kootenai, Lolo, and Idaho Panhandle National Forests. BMUs generally approximate the size of a female grizzly bear's home range and include all habitat components necessary for grizzly bear survival and reproduction. Grizzly bears that inhabit BMUs are considered critical to the recovery of the species.

35.    The Knotty Pine Project is almost wholly within BMU 12 (Newton). The Access Amendment standards for BMU 12 requires that open motorized road

16

density ("OMRD") be no greater than 1 mi/mi$^2$ in at least 45% of the BMU, total

motorized road density ("TMRD") be no greater than 2 mi/mi$^2$ in at least 31% of

the BMU, and at least 55% of the BMU contain secure core habitat (an area of

secure habitat that contains no motorize travel routes). Core areas do not include

any gated roads but may contain roads that are impassable due to vegetation or

constructed barriers.

36.     The Access Amendment states that once route closures that create

core areas are effective, these core areas must remain in place for at least 10 years.

Projects that result in a reduction of core within a BMU may only proceed if the

core is replaced with "in-kind replacement" concurrently or prior to incurring the

loss.


## V.     FACTUAL ALLEGATIONS

**Procedural Background**

37.     The Forest Service began scoping on the Project in 2019 and issued its

Scoping Letter on September 25, 2020.

38.     The Forest Service issued its Draft Environmental Assessment in

March of 2021 and its Final Environmental Assessment for the Knotty Pine Project

("Project EA") in October 2021.

39.     The Decision Notice, issued March 2022, implements Project EA Alternative 2.

40.     Plaintiff organizations submitted written comments and objections opposing the Project for its multiple legal violations and negative effects on wildlife.

41.     As required by Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), the Forest Service initiated consultation with FWS regarding the impacts of the Knotty Pine Project on grizzly bears, lynx and lynx critical habitat, bull trout and bull trout critical habitat, white surgeon, Spaldings campion, and whitebark pine.

42.     On April 27, 2021, the Forest Service issued a Biological Assessment determining that the Project may affect and is likely to adversely affect the grizzly bear and may affect but is not likely to adversely affect lynx and lynx critical habitat.

43.     On March 18, 2022, FWS issued a Biological Opinion concurring with the Forest Service and finding that the Project may affect and is likely to adversely affect grizzly bears, and is not likely to adversely affect lynx and lynx critical habitat.

44.     As of the date of this filing, the Forest Service has not yet advertised the Knotty Pine Project for implementation.

**Cabinet-Yaak Grizzly Bears**

45.    The Knotty Pine Project area lies within the Cabinet-Yaak Ecosystem

Recovery Zone ("CYE"), as identified and explained in the Grizzly Bear Recovery

Plan, the Kootenai National Forest Land Management Plan, and the 2020

Biological Opinion on the Forest Plan for grizzly bears.

46.    Most of the Project lies within BMU 12 (Newton) for grizzly bears.

47.    Only 1,200 acres of the Project area's Forest Service lands lie outside

BMU 12.

48.    Five collared bears reside in BMU 12, including one sow and two

cubs. The Forest Service acknowledges that these five bears have utilized the

Project area for a substantial amount of time.

49.    In 1993, FWS issued an updated Grizzly Bear Recovery Plan which

designated distinct "recovery zones" for grizzly bear recovery in the lower 48

states, one of which is the Cabinet-Yaak Ecosystem, and established targets for

recovery in each zone. U.S. Fish and Wildlife Service, Grizzly Bear Recovery Plan

(Sep. 10, 1993) ("1993 Recovery Plan"). The agency has determined that

conserving and recovering grizzly bears in each of the recovery zones is essential

to the conservation of the species.

50.    The Cabinet-Yaak Ecosystem is a roughly 2,600-square-mile area of

primarily federal public lands in northwest Montana and northeastern Idaho, and

includes the Knotty Pine Project area. The Recovery Plan established a population

19

size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population.

51.     Today, the population of the Cabinet-Yaak grizzly bear falls far below the recovery goal of 100 individual grizzlies.

52.     The most recent count of Cabinet-Yaak grizzly bears (published in 2021 for the 2020 monitoring year) is 45 bears (50 bears counted less 5 bears known dead). In comparison, the 2019 monitoring year report counted 50 total bears (54 bears counted less 4 bears known dead), while the 2018 monitoring year report counted 54 bears (none known dead). Thus, for the last three years, FWS has documented a decrease in the Cabinet-Yaak grizzly bear population.

53.     The Cabinet-Yaak grizzly population is also failing every recovery target set by the 1993 Recovery Plan. These targets include the target for females with cubs (33% of adult females should be with cubs each year), the target for distribution of females with cubs (18 of the 22 BMUs should be occupied by females with cubs), the female mortality limit (0 mortalities until a minimum of 100 bears is reached), and the mortality limit for all bears (0 mortalities until a minimum of 100 bears is reached).

54.     A 2016 peer-reviewed published study (Kendall et al. (2016)) on the Cabinet-Yaak grizzly bear finds: "Grizzly bear density in the CYE (4.3-4.5 grizzly bears/1,000 km$^2$) was among the lowest of interior North American populations.

The sizes of the Cabinet (n = 22-24) and Yaak (n =18-22) populations were similar."

55.    Further: "The 2 populations in the CYE were demographically and reproductively isolated from each other and the Cabinet population was highly inbred."

56.    Thus, "the small size, isolation, and inbreeding documented by this study demonstrate the need for comprehensive management designed to support CYE population growth and increased connectivity and gene flow with other populations."

57.    The study further finds: "In the small Cabinet and Yaak populations, the difference between growth and decline is 1 or 2 adult females being killed annually or not."

58.    Dr. David Mattson, a grizzly bear research scientist in Montana, submitted comments on the adjacent proposed Black Ram Project, which were re-submitted on the Knotty Pine Project, stating that "the entire corpus of research produced on viability of isolated or semi-isolated populations of bears and other large long-lived mammals shows that populations of 50-100 animals are acutely vulnerable to extinction (50-95% likely) over a relatively short period of time (100 years or less; e.g., Samson et al. [1985], Shaffer & Samson [1985], Suchy et al. [1985], Wiegand et al. [1998], Howe et al. [2007], McLellan [2020])."

59.    Thus, Dr. Mattson wrote, "an increased loss of even 1 adult female bear every 2-5 years can dramatically escalate risks of population extirpation, a point that has been emphasized in research on viability of bear populations (Suchy et al. 1985, Sæther et al. 1998)."

60.    As Dr. Mattson further notes: "Wilderness Areas and Inventoried Roadless Areas where road access is not allowed comprise around 56% of the [Northern Continental Divide Ecosystem] and [Greater Yellowstone Ecosystem]. In the Cabinet-Yaak Ecosystem this figure is less than half as much, nearer 21%. This difference alone can explain much of the corresponding difference in fates of grizzly bear populations. Despite these telling differences in fates and trajectories of grizzly bear populations, the road density and habitat security standards applied by the Kootenai National Forest are more lax, not less, than those applied on the Flathead National Forest."

61.    In January 2021, FWS produced its Species Status Assessment for grizzly bears. The assessment concludes that the Cabinet-Yaak grizzly population has "low" resiliency, which means a low ability for populations to persist in the face of stochastic events, or for populations to recover from years with low reproduction or reduced survival.

62.     As noted in Kendall et al.(2016), the Cabinet population would likely be extinct without artificial augmentation (i.e. trapping bears from other areas and trucking them into the CYE).

63.     The Species Status Assessment finds that the only circumstance under which this population would increase to "high" resiliency would be with a significant increase in conservation measures.

**The Impact of Roads on Grizzly Bears**

64.     FWS has long found that roads likely pose the most imminent threat to grizzly bear habitat today and that the management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears. 1993 Recovery Plan; Interagency Grizzly Bear Committee, Taskforce Report: Grizzly Bear–Motorized Access Management (1994).

65.     Roads pose a threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental and defense-of-life shootings and intentional poaching.

66.     Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers.

67.     Roads and human access also result in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat

conditions.

68.     Displacement may have long-term effects: "Females who have

learned to avoid roads may also teach their cubs to avoid roads. In this way,

learned avoidance behavior can persist for several generations of bears before they

again utilize habitat associated with closed roads." 1993 Recovery Plan 146.

69.     Grizzly bears are displaced from open and closed roads: "[G]rizzlies

avoided roaded areas even where existing roads were officially closed to public

use[]. Females with cubs remained primarily in high, rocky, marginal habitat far

from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic,

and/or authorized use behind road closures may account for the lack of use of areas

near roads by female grizzly bears in this area. This research demonstrated that a

significant portion of the habitat in the study area apparently remained unused by

female grizzlies for several years. Since adult females are the most important

segment of the population, this lack of use of both open-roaded and closed-roaded

areas is significant to the population." *Id.*

70.     Displacement may negatively impact the survival rates of grizzly

cubs: "[S]urvivorship of the offspring of females that lived in unroaded, high

elevation habitat was lower than that recorded in other study areas in the [Northern

Continental Divide Ecosystem]. The majority of this mortality was due to natural

factors related to the dangers of living in steep, rocky habitats. This is important in

that the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of young when their mothers are forced to live in less favorable areas away from roads." *Id.*

71.     FWS's 1993 Recovery Plan further finds that "[t]imber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/ grizzly bear confrontation potential or disturbance factors as a result of road building and management. New roads into formerly unroaded areas may cause bears to abandon the area." *Id.* at 8.

72.     In light of these harms, current peer-reviewed science still finds that roads pose significant threats to grizzly bear survival: "[o]f all the covariates we examined, the amount of secure habitat and the density of roads in nonsecure habitat on public lands had the greatest effect on grizzly bear survival." C. Schwartz, et al., *Hazards Affecting Grizzly Bear Survival in the Greater Yellowstone Ecosystem*, 74(4) J. Wildl. Manag. 654 (2010).

73.     When analyzing effects of actions on grizzly bears, the Forest Service uses "research benchmarks," to assess effects to grizzly bears from motorized use. The "research benchmarks" are based on average levels of access and secure habitat reported by Wakkinen and Kasworm in 1997. W.L. Wakkinen and W.F.

Kiasworm, *Grizzly bear and road density relationships in the Selkirk and Cabinet-Yaak recovery zones,* Idaho Dept. Fish and Game, U.S. Fish and Wildlife Service (1997).

74.     The "research benchmarks" that the Forest Service utilizes state that grizzly bears with cubs in the CYE are adequately supported when 33% of a female grizzly bear's home range has OMRD levels no greater than 1 mi/mi[2,] 26% of a female grizzly bear's home range has TMRD levels no greater than 2 mi/mi$^2$, and a minimum of 55% of a female's home range is comprised of core area.

75.     These research benchmarks differ from the Access Amendment Standards for BMU 12. The Access Amendment Standards for BMU 12 allow for more areas with high road density (i.e., are worse) than the research benchmarks.

**The Access Amendment**

76.     FWS and the Forest Service sought to address what it considered one of the primary drivers of the problems facing the grizzly bears in the Cabinet-Yaak Ecosystem – i.e., roads – in 2011, when it approved the Access Management Amendment for grizzly bears.

77.     The Access Amendment responds to and acknowledges the Agencies' belief that "a viable road and access management plan is the most

important factor influencing the long-term impacts on grizzly bears in habitat influenced by timber harvesting."

78. The Access Amendment amends Forest Plans in the Cabinet-Yaak and Selkirk Ecosystems to include a set of wheeled motorized access and security standards intended to meet the Forest Service's responsibilities under the Endangered Species Act to conserve and contribute to the recovery of grizzly bears.

79. The Kootenai National Forest adopted the Access Amendment as a mandatory standard into its Forest Plan in November 2011, which was retained in the 2015 Kootenai National Forest Plan.

80. Within the CYE Grizzly Bear Recovery Zone, the Access Amendment sets specific numeric limits on total motorized route density and open motorized route density, and requires a specific numeric minimum of secure (i.e. roadless) habitat.

81. The Access Amendment standards for BMU 12 require that OMRD be no greater than 1 mi/mi$^2$ in at least 45% of the BMU, TMRD be no greater than 2 mi/mi$^2$ in at least 31% of the BMU, and at least 55% of the BMU contain secure core habitat.

82. The Access Amendment also requires specific parameters for establishing and managing core habitat in BMUs.

83.    The Access Amendment notes that "[c]ore areas include high quality habitat within a BMU that contains no motorized travel routes or high use trails" and is more than .31 miles (500 meters) from a road.

84.    Additionally, "[c]ore areas do not include any gated or restricted roads but may contain roads that are impassable due to re-growth of vegetation, effective barriers other than gates, or placement of logging or forest debris so *as to no longer function as a motorized route*." (Emphasis added).

85.     "[L]osses to existing core must be compensated with in-kind replacement concurrently or prior to incurring the losses" under the Access Amendment.

86.    The Access Amendment requires that in the Cabinet-Yaak Recovery Zone, road use associated with administrative activities "shall not exceed 60 vehicle round trips per active bear year per road, apportioned as follows: ≤18 round trips in spring (April 1 through June 15); ≤23 round trips in summer (June 16 through September 15); and ≤19 round trips in fall (September 16 through November 30)."

87.    If the number of trips exceeds 60 trips per active bear year and/or exceeds the allowable seasonal trips, then that road must be considered "open" for purposes of calculating OMRD, TMRD, and core.

88.     The Access Amendment also requires that the Kootenai National Forest submit annual monitoring reports detailing progress made toward achieving the OMRD, TMRD, and core standards; allowances for entering core area; and results from visually checking at least 30 percent of closure devices to ensure effective implementation of open road density parameters.

89.     In a 2020 Closure Monitoring Report, the Forest Service disclosed that during its monitoring of 30 percent of closures, they found five illegal roads in BMU 12. The Closure Monitoring Report states that rather than closing and decommissioning these roads, it "will consider [including them] in a [Good Neighbor Authority] contract."

90.     The Good Neighbor Authority policy was authorized under the 2014 Farm Bill and allows states to work on behalf of federal agencies to carry out timber sales. In Montana, the Montana Department of Natural Resources and conservation partners with the Forest Service work together to plan and implement timber sales.

91.     Thus, because the Closure Monitoring Report states that the Forest Service will "include" the roads under a Good Neighbor Authority timber sale, USFS will likely be adding the illegal roads identified in the most recent monitoring report to the National Forest Road System.

92.    The Project EA does not discuss or disclose this most recent monitoring report.

**Knotty Pine Project Authorization**

93.    The Forest Service signed the Knotty Pine Final Decision Notice and Finding of No Significant Impact ("Decision Notice") authorizing the Project on March 24, 2022.

94.    The Project is located on the Three Rivers Ranger District of the Kootenai National Forest.

95.    The Project area is located north and west of Troy, Montana in Lincoln County. Line Point, Murphy, and Red Top mountains form the northern boundary of the Project. The Idaho state line forms the western edge, the Kootenai River the southern boundary, and the Yaak River the eastern boundary.

96.    The Project area is 56,009 acres, of which 48,637 acres are Kootenai National Forest Service lands.

97.    The Project area includes 13,466 acres of the Buckhorn Ridge Inventoried Roadless Area.

98.    The Project will result in the removal of more than 29 million board feet of timber from the Project area.

99.    The Decision Notice authorizes:

(a)  logging on 5,070 acres;

(b) prescribed burning on 4,757 acres;

(c) "reconstruction" of 35 miles of roads;

(d) re-opening of 11.6 miles of barriered roads contributing to grizzly

bear secure core;

(e) construction of 2.2 miles of temporary roads;

(f) the addition of 3.76 miles of "undetermined roads" to the National

Forest System ("NFS");

(g) "storage" of 4 miles of currently closed roads that would remain part

of the NFS.

100.   The Project will not decommission any roads currently within the

Project area.

101.   The roads that the Project will open, reconstruct, and utilize for timber

harvest and hauling will not be barriered, made impassable, or obliterated

following Project completion.

102.   The Project will only decommission 2.2 miles of temporary roads it

authorizes for construction.

103.   The Project will result in 14 openings created by clearcuts exceeding

40 acres in size, with the largest opening being 224 acres (or about the size of 170

football fields).

104.    The Project authorizes 57 acres of logging and 41 acres of burning in old growth stands.

105.    The Project will be implemented over a ten-year period.

106.    The majority of the prescribed burning authorized by the Decision Notice will occur in grizzly bear secure core.

107.    The majority of prescribed burning authorized by the Decision Notice will be done by aerial (helicopter) ignition within grizzly bear secure core.

108.    The Project also authorizes logging and road usage in grizzly bear secure core.

109.    The Forest Service concedes that past timber harvest in the Project area was intensive in scale.

110.    Regeneration and intermediate harvests have occurred on approximately 10,300 acres and 5,000 acres of National Forest land in the Project area, respectively. Precommercial thinning has occurred on about 4,000 acres of National Forest land in the Project area.

111.    There are large areas adjacent to the Project area that have been logged and or burned within the past decade under the Buckhorn Project. The Buckhorn Project also opened roads within grizzly bear secure core.

112.   The Buckhorn Project's harvest has been completed but several of the prescribed burns using helicopter ignition are set to occur concurrently with the implementation of the Knotty Pine Project.

113.   The Knotty Pine Project area is also adjacent to the several other proposed and ongoing logging and roadbuilding projects: the Lower Yaak, O'Brien, Sheep (OLY) Project area shares a boundary with the Knotty Pine Project; the Black Ram Project is within ten miles of the Knotty Pine Project; and the North-East Yaak Project is both north and west of the Knotty Pine Project area.

**Knotty Pine Project Roads**

114.   There are currently 175.2 miles of NFS Roads in the Project area. 134.6 miles are "closed" year-round, 33.4 miles are open year-round, and 7.2 miles are open seasonally.

115.   While the Decision Notice does not authorize permanent road construction, it does authorize 2.2 miles of temporary road construction.

116.   The Forest Service states that these temporary roads would be decommissioned following activities.

117.   The Project EA only states that "decommissioning is the act of removing a road from the road system" and notes that the Forest Plan requires that roads being decommissioned "are to be left in a hydrologically stable condition." The Project EA does not state whether the temporary roads will continue to exist

on the landscape or whether they will be obliterated so that they become impassable.

118.    The Project EA also does not discuss whether these roads will be gated, barriered, or recontoured to render them impassable.

119.    The Project will reconstruct 35 miles of haul roads and states that "these roads are intended for long-term access, and in some cases, would remain open to public vehicle travel. . ." following Project activities.

120.    The Project will further add 4.17 miles of "undetermined roads" to the National Forest Road System.

121.    Undetermined roads are road prisms that either (a) exist on the landscape from previous management activities or (b) were illegally created by users, but are not authorized as part of the NFS.

122.    Thus, each undetermined road segment in the Project area is either (a) a former project road that was supposed to be "temporary" and removed from the landscape as part of that former project but instead was unlawfully left on the landscape by the Forest Service, or (b) an illegal user-created road.

123.    The Project EA does not disclose the origin of the undetermined roads – i.e. whether each undetermined road segment was user-created or created during a prior project.

124.   The Project EA would not decommission the 4.17 miles of "undetermined roads" following Project activities but instead would keep them available for future projects.

125.   The Project authorizes the re-opening of 11.57 miles of currently barriered roads to be used for harvest activities.

126.   Following Project activities, only 1.71 miles of these re-opened roads would be re-barriered. The remainder would be gated.

127.   In total, the Forest Service would only decommission 2.2 miles of temporary roads used for the Project. The remaining 45 miles of reconstructed roads, re-opened roads, and undetermined roads would remain on the ground following Project activities.

128.   The Forest Service states, "[r]estricted, barriered, and new roads constructed and/or opened for activities would be gated for administrative use only upon project completion."

129.   The Forest Service discloses that "[t]he long-term management of barriered roads opened for project use differs by management activity. Those opened for harvest would be managed as gated to allow for continued management of the area (e.g., fuels management, future thinning). New roads constructed for use during harvest (not including temporary routes) would remain part of the gated road system upon completion of harvest activities or resecured with barriers."

130.   This is important because, under the Access Amendment, grizzly bear secure core cannot include gated roads. Any gated road must count toward TMRD.

131.   The Forest Service states that the Project would impact existing core in BMU 12.

132.   However, the Forest Service does not fully disclose the extent of harmful impact that will result from the opening of currently barriered roads in grizzly bear core.

133.   Additionally, the Project authorizes the permanent opening of currently barriered and obliterated roads in grizzly bear secure core to access logging units.

134.   As noted above, "losses to existing core must be compensated with in-kind replacement concurrently or prior to incurring the losses" under the Access Amendment.

135.   The Project will store 4.04 miles of currently closed roads for "in-kind replacement of core."

136.   However, the Project EA does not disclose how many miles and which roads within grizzly bear secure core will be utilized for the Project, nor does the Project EA disclose how many acres of secure core these roads will affect.

137.   Thus, the Project EA fails to demonstrate that the amount of in-kind replacement for grizzly bear core equates to the amount of core lost by opening of currently barriered roads in grizzly bear secure core.

138.   The Forest Service also failed to identify additional roads that may impact grizzly bear secure core or otherwise contribute to TMRD. For example, the Forest Service discloses that the Project will result in roads exceeding the allowable administrative use trips as set by the Access Amendment, but the Project EA fails to disclose the location and milage of the roads that will exceed the allowable administrative trips.

139.   The Forest Service states that "[a]ll roads that may exceed administration trips were considered open for the bear year, and reported in temporary changes to motorized route density."

140.   However, the Project EA does not disclose which roads will be utilized, identify the location of these roads, or disclose how many miles of roads will have more than 60 administrative use trips in the Project area.

141.   Moreover, the Project EA did not disclose how many private and state roads exist in the Project area and BMU 12, even though these roads impact grizzly bears and grizzly bear habitat the same way Forest Service roads would impact them.

142.   Similarly, the Forest Service concedes that "[a]ny obvious skid trails or illegally developed roads, for which the Forest Service already has the authority to eliminate traffic, were not analyzed, or considered as roads."

143.   In October 2020, the Yaak Valley Forest Council provided the USFS with a Road Barrier Survey ("YVFC Road Survey") documenting extensive illegal road usage and ineffective barriers across the Knotty Pine Project area.

144.   The illegal road usage and ineffective barriers identified in the YVFC Road Survey have not been remedied as of the date of this filing.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*The Knotty Pine EA violates NEPA because it fails to take a hard look at effects to grizzly bears.*

145.   All previous paragraphs are incorporated by reference.

146.   NEPA requires that agencies take a "hard look" at the environmental impacts of proposed actions. 40 C.F.R. § 1500.1(b).

147.   The Project EA fails to take a hard look at impacts to grizzly bears.

148.   Pervasive and ongoing illegal road usage exists in the Project area. The Project EA fails to disclose and discuss the illegal roads on the Project area and further fails to analyze the effects that illegal roads have on grizzly bears in the

Project area, including how illegal road usage impacts the TMRD, OMRD, and core.

149.   The Project EA fails to disclose and discuss the most recent Forest Service Annual Monitoring Summary Report which reports the amount of illegal road usage found by the agency in BMU 12.

150.   The Project will increase road densities in the Project area by opening a significant number of currently closed and/or barriered roads and adding undetermined roads to the system and exceeding the allowable use limits set by the Access Amendments. The Project EA does not propose decommissioning roads that will be utilized during the Project. The Project's exacerbation of high road densities will likely displace female grizzly bears and cubs that currently use the area. The Project EA fails to adequately disclose and analyze the Project's impacts on TMRD and OMRD because it fails to disclose the miles of roads currently on the Project area and also fails to disclose the increase in miles of roads in the Project area following implementation. Thus, neither the decisionmaker nor the public can calculate or understand road density in the Project area prior to and following Project activities.

151.   The Project EA fails to disclose that the Project will impact a significant amount of grizzly bear secure core by permanently opening currently barriered roads in grizzly bear secure core to access logging units also within secure

core. The Project EA further fails to analyze the impact of significantly reducing grizzly bear secure core without providing an in-kind replacement.

152.   The Project includes logging, helicopter use, and road use in grizzly bear secure core. The Project EA fails to adequately disclose and analyze the impacts these activities will have on grizzly bears in the area.

153.   The Project EA also fails to analyze and disclose the cumulative effects of past "temporary" roads or failed road mitigation and how that has led to high road density and numerous "undetermined" roads in the area. Nor does the Project EA analyze the cumulative impacts on grizzly bears of other proposed and ongoing logging and road-building projects adjacent to and in close proximity to the Project area, including the cumulative impacts of Black Ram, OLY, and Buckhorn, and the cumulative impacts of helicopter-ignited burning authorized by the Buckhorn Project in grizzly bear secure core.

154.   The Project fails to disclose which roads in grizzly bear core were closed within the last 10 years and therefore the public is unable to determine whether the roads authorized for use for the Knotty Pine Project were previously closed for the purposes of contributing to core.

155.   The failure to consider these impacts and disclose them to the public was arbitrary and capricious and unlawful in violation of NEPA and the APA.

### SECOND CLAIM FOR RELIEF
*The Knotty Pine EA violates NEPA, NFMA, and the APA because it*

*fails to demonstrate Forest Plan Compliance.*

156.   All previous paragraphs are incorporated by reference.

157.   NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of NFS lands shall be consistent with" the applicable Forest Plan. 16 U.S.C. § 1604(i).

158.   The Project area is almost wholly encompassed in BMU 12. Therefore, the Access Amendment standards incorporated into the Kootenai National Forest Plan apply to this Project.

159.   The Project results in a violation of the Access Amendment standards for BMU 12.

160.   The Project EA fails to adequately discuss and disclose the effects of the known and pervasive illegal road usage on grizzly bears and therefore fails to demonstrate that the Project complies with the Access Amendment TMRD and OMRD standards, as well as core standards for BMU 12.

161.   The Project will permanently open a significant number of currently barriered roads in grizzly bear core. The Project EA fails to demonstrate that the amount of in-kind core replacement replaces the amount of core lost through Project activities as required by the Access Amendment.

162.    The Project EA fails to demonstrate that the Project's increase in permeant roads is consistent with the Access Amendment standards for road density and core.

163.    The Project EA's failure to disclose whether and how the Knotty Pine Project complies with the Access Amendment standards as applicable to BMU 12, and the Forest Service's failure to ensure that the Project is consistent with the Access Amendment Standards for BMU 12, violates NFMA's consistency provision (16 U.S.C. § 1604(i)) and NEPA's "hard look" mandate.

164.    The Project EA's failure to demonstrate compliance with provisions of the Forest Plan and its failure to inform the public of the Project's environmental impact is a violation NFMA and NEPA, and is arbitrary and capricious, in violation of the APA.

**THIRD CLAIM FOR RELIEF**
*The Forest Service's refusal to prepare a full EIS for the Knotty Pine Project violates NEPA and the APA.*

165.    All previous paragraphs are incorporated by reference.

166.    An EIS is required under NEPA to examine any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

167.    An EIS must be prepared if substantial questions are raised whether a project may cause significant degradation of some human environmental factor. To

trigger this requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient.

168.   In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must consider what "significantly" means. NEPA regulations give it two components: context and intensity. 40 C.F.R. § 1508.27. Context refers to the setting in which the proposed action takes place; intensity means "the severity of the impact." *Id*

169.   The Forest Service failed to prepare an EIS to analyze the impacts of the Knotty Pine Project despite the fact that, among other things: (1) the Project may significantly harm unique characteristics of the area, including lands; 2) the Project may have cumulatively significant impacts; 3) the Project will likely adversely affect grizzly bears; and 4) the Project will result in violation of the Kootenai National Forest.

170.   The Forest Service's "Finding of No Significant Impact," and its failure to complete an environmental impacts statement, despite the fact that the Knotty Pine Project may significantly affect the quality of the environment, violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## VII.   RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.    Declare that the Project decision violates the law;

B.    Either vacate the Project decision or enjoin implementation of the Project;

C.    Award Plaintiffs costs and reasonable attorney's fees as authorized

      by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any

      other statute; and

D.    Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 17th day of May, 2022.

                         */s/ Kristine M. Akland*
                        Kristine M. Akland
                        CENTER FOR BIOLOGICAL DIVERSITY

                        Andrea Zaccardi
                        CENTER FOR BIOLOGICAL DIVERSITY
                        *Attorneys for Plaintiffs Center for Biological*
                        *Diversity, Yaak Valley Forest Council, and*
                        *WildEarth Guardians*

                        Timothy M. Bechtold
                        BECHTOLD LAW FIRM, PLLC
                        *Attorneys for Plaintiffs Alliance for the Wild*
                        *Rockies and Native Ecosystems Council.*