IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ALLIANCE FOR THE WILD ROCKIES, YAAK VALLEY FOREST COUNCIL, WILDEARTH GUARDIANS, and NATIVE ECOSYSTEMS COUNCIL, | CV 22–91–M–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| U.S. FOREST SERVICE; LEANNE MARTEN, Regional Forester of U.S. Forest Service Region 1; CHAD BENSON, Supervisor of the Kootenai National Forest; and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| KOOTENAI TRIBE OF IDAHO, | |
| Intervenor-Defendant. | |

Before the Court is Plaintiffs' Motion for Preliminary Injunction.  (Doc. 73.)

For the reasons stated herein, the motion will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Center for Biological Diversity, Alliance for the Wild Rockies, Yaak Valley Forest Council, Wildearth Guardians, and Native Ecosystems Council ("Plaintiffs") filed this lawsuit on May 17, 2022 against the U.S. Forest Service, Leanne Marten, and Chad Benson (collectively, "USFS").  (Doc. 1.)  Plaintiffs' Amended Complaint, filed July 29, 2022, added the U.S. Fish & Wildlife Service ("FWS") as a defendant.  (Doc. 14.)  Plaintiffs' Amended Complaint alleges that Defendants' approval of the Knotty Pine timber sale Project (the "Project") within the Kootenai National Forest violated the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), the Administrative Procedure Act (APA), and the Endangered Species Act (ESA).  (Doc. 14 at 4.)

The parties filed briefing on cross-motions for summary judgment from October 12, 2022 through March 22, 2023, and the motions had been referred to U.S. Magistrate Judge DeSoto.  On March 14, 2023, USFS and FWS (collectively, "Federal Defendants") filed a motion to expedite the summary judgment proceedings, which stated that Federal Defendants "have now confirmed that, in addition to no commercial timber harvest or associated road construction or reconstruction activities, no precommercial thinning and no fuels reduction treatments authorized by the Knotty Pine Project will begin until May 15, 2023, at

2

the earliest, and Federal Defendants will provide 30-days' advance notice before any of these additional activities begin."  (Doc. 72.)[1]

Six days later, Plaintiffs filed the instant motion for a preliminary injunction. (Doc. 73.)  The undersigned withdrew the case referral to Judge DeSoto in light of the short timeline between the close of summary judgment briefing and the potential start date for on-the-ground project activities and set a hearing on the motion for preliminary injunction.  (Doc. 75.)

The Knotty Pine Project

The Knotty Pine Project area consists of 56,009 acres located in Lincoln County, Montana, in the Three Rivers Ranger District of the Kootenai National Forest.  FS1015.  The Project area includes 48,637 acres of National Forest System lands, 42,823 of which are in the Wildland Urban Interface.  *Id.*  The Project includes commercial harvest on 2,593 acres, non-harvest fuel treatments (ecosystem and ladder fuel reduction burning) on 4,757 acres, and precommercial thinning on 2,099 acres.  *Id.*  The Project authorizes a total of 7,465 acres of

---

[1] Federal Defendants subsequently submitted an affidavit stating that USFS had informed Plaintiffs that non-harvest fuels reduction treatments may begin as early as May 15, 2023, and all other project activities, including commercial harvest and any associated road work and pre-commercial thinning, will not begin until June 15, 2023, at the earliest.  (Doc. 82-1 at 3–4.)  The affidavit further states that USFS has the goal of starting fuels reduction work before the summer fire season and starting commercial harvest and precommercial thinning work before cold weather effectively prevents those treatments from taking place in 2023.  (*Id.* at 4.)  Federal Defendants submitted yet another notice on April 14, 2023, stating that fuels reduction work will begin as early as May 26, 2023.  (Doc. 86.)

prescribed burning.  FS940.  The Project also includes adding 3.76 miles of an

undetermined road to the road system, 1.2 miles of temporary road construction, 35

miles of road maintenance, and 4.04 miles of road storage.  FS1015.  The

timeframe for the Project is approximately ten years.  FS1567.  The stated purposes

of the Project in the decision notice include promoting resilient vegetation

conditions by managing for landscape-level vegetation patterns, structure, patch

size, fuel loading, and species composition; reducing the potential for high

intensity wildfires while promoting desirable fire behavior characteristics and fuel

conditions in the wildland urban interface; providing forest products that contribute

to the sustainable supply of timber products from National Forest System lands;

and enhancing big game winter conditions and improving wildlife forage habitat.

FS936–38.

The Grizzly Bear

> In 1975, the Fish and Wildlife Service listed the grizzly bear as
> "threatened" under the ESA, and in 1993 it promulgated a revised
> Grizzly Bear Recovery Plan ("Recovery Plan").  The Recovery Plan
> designates as "recovery zones" areas in the Kootenai National Forest in
> which there is a significant likelihood of grizzly bear presence.  The
> Recovery Plan prescribes forest management measures within these
> zones to protect grizzly bears and to facilitate their survival and
> reproduction.  The Recovery Plan also designates areas outside the
> recovery zones that grizzly bears sometimes frequent, called "Bears
> Outside of Recovery Zones" or "BORZ polygons."  The Recovery Plan
> prescribes less protective management measures in BORZ polygons
> than in recovery zones.

*All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1240 (9th Cir. 2017).

4

The Project area lies within the Cabinet-Yaak Ecosystem Recovery Zone ("CYE"), and most of the Project lies within Bear Management Unit ("BMU")[2] 12 for grizzly bears. FS1541; FWS11. "The CYE is a smaller ecosystem that is still slowly recovering from being close to historical extirpation" of grizzly bears. FWS16. The parties dispute the estimated number of grizzly bears in the CYE (Doc. 61 at 27–28), but the most recent population estimate detected a minimum of 50 grizzly bears alive at some point during 2019, five of which were known to be dead by the time the annual report was published. FWS1064. Within the CYE, several recovery targets have not yet been met, including the number and distribution of female grizzly bears with cubs, and the number of BMUs (18 out of 22) with young. FWS18. Additionally, habitat standards for motorized route densities have not yet been met in the CYE recovery zone. FWS18. The Biological Opinion for the Project ("Project BiOp") acknowledges that "the CYE population has seen improvements over the past few decades but is still a small population in which the survival and reproduction of each individual female grizzly bear is very important." FWS18.

---

[2] "BMUs are analysis area that approximate the lifetime size of a female's home range, but they are not meant to depict the actual location of female home ranges on the landscape. BMUs were originally identified for management purposes to provide enough quality habitat for home range use and to ensure that grizzly bears were well distributed across each recovery zone (IGBC 1994). Because BMUs approximate female home ranges, they are an appropriate scale to use for assessing the effects of proposed actions on individuals for the purposes of Section 7(a)(2) consultation." FWS11.

"Grizzly bears have used the action area (BMU 12) for decades including multiple male grizzly bears. And importantly, the action area has been an important area for female grizzly bears over the past several decades and has housed multiple reproductive females that have contributed to the CYE population." FWS21. "One female was observed as recently as September of 2021 with collared yearling offspring" in BMU 12, and researchers have observed females with cubs or young in BMU 12 for five of the last ten years. FWS21.

Although Plaintiffs' complaint raises many claims, two are emphasized in their motion for a preliminary injunction. First, Plaintiffs argue that FWS failed to adequately analyze the effects that illegal roads have on grizzly bears in the Project area, in violation of the ESA and APA's mandates to consider the best available information and relevant factors. (Doc. 74 at 20–24.) And second, Plaintiffs argue that the Project violates the ESA and APA by authorizing over 1,300 acres of precommercial thinning in core habitat for grizzly bears "without disclosing how the units will be accessed and without discussing the effect on grizzly bears[.]" (*Id.* at 24–29.)

Federal Defendants and Intervenor-Defendant Kootenai Tribe of Idaho filed responses to Plaintiff's motion for a preliminary injunction (Docs. 81, 82), Plaintiffs filed a reply (Doc. 83), and the Court held a hearing on the motion on April 19, 2023.

6

Additional facts in the record are discussed as they become relevant in the analysis below.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  However, the Endangered Species Act "strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted"; "when evaluating a request for injunctive relief to remedy an ESA procedural violation, the equities and public interest factors always tip in favor of the protected species." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090–91 (9th Cir. 2015).  Where a plaintiff demonstrates that the balance of hardships "tips sharply toward the plaintiff," that there is a likelihood of irreparable injury, and that the injunction is in the public interest, "serious questions going to the merits" of the plaintiff's claims "can support issuance of a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

ESA claims are reviewed under the APA standard, "[i]rrespective of whether an ESA claim is brought under the APA or the citizen-suit provision." *All. for the*

*Wild Rockies v. Krueger*, 664 F. App'x 674, 675 (9th Cir. 2016) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011)).  The APA requires a reviewing court to set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.  *Id.*  A court may not accept an agency's post hoc rationalizations for its action.  *Id.* at 50.  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Id.*

Section 7(a)(2) of the ESA provides:

Each Federal agency shall, in consultation with and with the assistance of the Secretary[ of Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is

8

determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section.  In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).  In relevant part, Section 7(b)(3)(A) of the ESA provides:

Promptly after conclusion of consultation . . . , the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.

16 U.S.C. § 1536(b)(3)(A).

The ESA's implementing regulations expand upon these requirements.  If the action agency—here, USFS—determines that its action may affect a listed species or critical habitat, formal consultation is required, subject to exceptions not applicable here.  50 C.F.R. § 402.14(a)–(b).  An agency requesting formal consultation "shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat."  50 C.F.R. § 402.14(d).

FWS, in turn, has numerous responsibilities during formal consultation, including:

(1)     Review all relevant information provided by the Federal agency or otherwise available.  Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

9

(2)    Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3)    Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4)    Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.
. . .
(7)    Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8)    In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

50 C.F.R. § 402.14(g).  FWS's biological opinion must include "[a] summary of the information on which the opinion is based," a "detailed discussion of the environmental baseline of the listed species and critical habitat," a "detailed discussion of the effects of the action on listed species or critical habitat," and the Service's jeopardy or no jeopardy opinion.  50 C.F.R. § 402.14(h).  The formal consultation process ends with FWS's issuance of the biological opinion.  50 C.F.R. § 402.14(m)(1).

## DISCUSSION

### I.      Likelihood of Success on the Merits

Plaintiff is likely to succeed on the merits of its ESA claim challenging

Defendants' failure to adequately consider the impacts of unauthorized motorized

access.

### A. History of Litigation Concerning Illegal Roads in the Kootenai National Forest

This case is one of the latest challenges to USFS projects within the

Kootenai National Forest involving motorized access, and a brief discussion of this

litigation history may help to place the present case in its broader context.  In 2011,

the Kootenai Forest Plan was amended by the Forest Plan Amendments for

Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear

Recovery Zones ("Access Amendments").  *All. for the Wild Rockies v. Bradford*,

856 F.3d 1238, 1240 (9th Cir. 2017).  The Record of Decision for the Access

Amendments established motorized-vehicle access restrictions in grizzly bear

recovery zones and in BORZ polygons.  *Id.*

In 2013, Alliance for the Wild Rockies challenged the Pilgrim Creek Timber

Sale Project, arguing that it would create a net increase in linear miles of total

roads in the Clark Fork BORZ polygon, in violation of the standards set by the

Access Amendments.  *Id.* at 1241.  This Court enjoined the Pilgrim Project

pending preparation of a supplemental EIS.  *Id.*  The Court lifted the injunction after USFS issued a Clarification/Amendment of the record of decision, which stated that all new permanent road segments and all new roads constructed for the project would be made impassable to motorized vehicles with the installation of an earthen barrier, rocks, or other barrier after completion of harvest-related activities. *Id.* at 1241–42.  The Ninth Circuit affirmed that decision, holding that "it was not arbitrary and capricious for the Forest Service to conclude that roads closed to motorized access by berms or barriers do not count toward 'linear miles of total roads'" as defined by the relevant standard set by the Access Amendments.  *Id.* at 1242–43.  The court of appeals rejected AWR's argument that USFS's contemplated berms would not effectively prevent motorized use of the new roads by all-terrain vehicles because there was no record evidence refuting USFS's assertion that berms would effectively prevent motorized use, but the court cautioned that "any closure that fails to effectively prevent motorized access" would fail to comply with the applicable Access Amendments standard.  *Id.* at 1243.  The court further noted that "closure only by gates" that allowed access to the road for maintenance and other purposes "clearly did not comply with the manner and degree of closure required by" the Access Amendments standard at issue. *Id.*

In 2018, AWR again challenged the Pilgrim Project, and AWR proved that "ineffective closures have contributed to increases in linear road miles and potentially impacted grizzly bears in ways not previously considered." *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1195 (D. Mont. 2019) ("*Probert*").  Accordingly, the court ordered Defendants to reinitiate consultation on both the Access Amendments and the Pilgrim Project.  *Id.*  As relevant here, the defendants in that case conceded that the Access Amendments did not directly reference temporary mileage increases caused by ineffective road closures, but they argued such effects were considered because the Access Amendments contemplated temporary increases in road miles for other reasons, such as temporary roads constructed to access harvest units.  *Id.* at 1204.  They further "emphasize[d] the ephemeral nature of ineffective closures, asserting that once discovered, breaches are typically repaired by the next bear year."  *Id.* (internal quotation omitted).  But the court agreed with AWR that temporary road use contemplated by the Access Amendments was different in kind from illegal use precipitated by ineffective closures because the former was regulated, while the latter was not.  *Id.* at 1204–05.  The court further concluded that "while a single breach may itself be temporary, the Forest Service's annual monitoring reports indicate consistent unauthorized use.  Thus, at a minimum, illegal temporary use appears to impact grizzly bears 'in a manner . . . not previously considered . . . .'"

13

*Id.* at 1205 (quoting 50 C.F.R. § 402.16(b)).  The court thus required reinitiation of consultation on the Access Amendments.  The court likewise required reinitiation of consultation on the Pilgrim Project because it was tiered to the Access Amendments, and "the continued uncertainty as to the scope of illegal use" outweighed USFS's insistence that ineffective closures were considered in concluding that baseline total linear mileage levels would not be exceeded.  *Id.* at 1206.

Next in the saga came *Alliance for the Wild Rockies v. Marten*, 464 F. Supp 3d 1169 (D. Mont. 2020).  In that case, the plaintiffs challenged the federal defendants' compliance with the Health Forest Restoration Act, arguing that the Willow Creek Project did not comply with requirements that no new permanent roads be established and that temporary roads be decommissioned within three years.  *Id.* at 1175.  The court rejected this argument and distinguished the case from *Probert*, which "dealt with documented historic road closures"; in *Marten*, the plaintiffs only "speculate[d] that the Willow Creek Project's temporary roads will not be effectively obliterated in the future," and the court found plaintiffs' position "untenable" because it would apply to all projects "based on the mere possibility that planned road closures will be ineffective."  *Id.* at 1176.

Most recently, this Court issued a preliminary injunction against the Ripley Project in *Alliance for the Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022 (D.

Mont. 2022).  The Ripley Project area was approximately two miles from the CYE

Recovery Zone and less than one mile from the Cabinet Face BORZ area.  *Id.* at

1027–28.  The locations of at least three radio-collared male grizzly bears had been

recorded within the project area in the preceding five to seven years.  *Id.* at 1028.

The agencies in that case relied upon a "worst-case scenario" assumption for all

state and private lands within the project area for purposes of the environmental

baseline and assumed that those lands would provide no secure habitat for grizzly

bears; accordingly, they argued, FWS did not need to know or mention specifics of

known ongoing or future timber harvest and motorized access on state and private

lands in the project's biological opinion.  *Id.* at 1031–32.  The problem with that

assumption was that it was concededly false; the agencies acknowledged facts in

the record that grizzly bears within or near the project area primarily used private

lands.  *Id.* at 1032.  The Court held that FWS's decision not to obtain or disclose

data concerning reasonably certain future state and private activities and the

agencies' decision to rely on factual assumptions they knew to be incorrect in

assessing the Ripley Project's cumulative effects on the grizzly bear violated the

ESA and were arbitrary and capricious.  *Id.*

## B. The Knotty Pine Project

The agencies engaged in formal consultation concerning the grizzly bear at

USFS's request after USFS's biological assessment found that the Knotty Pine

15

Project may affect and is likely to adversely affect the grizzly bear.  FWS1.

USFS's finding relied in part on consistent research findings that grizzly bears tend

to avoid roads and areas near roads, FS1552–54, and its findings that existing

motorized access condition in BMU 12 is adverse because research benchmarks

were not met and were unlikely to ever be met, and open motorized route density

would temporarily increase during Project implementation, FS1580.

A significant portion of the Project BiOp focuses on motorized access and

its impacts on secure habitat, which it identifies as a stressor affecting grizzly bears

in the CYE and the Project area.  FWS22.  "Secure habitat has been identified as

one of the key issues related to effects of motorized access on grizzly bears and is

important to the survival and reproductive success of grizzly bears."  FWS33.  As

relevant here, FWS utilized three metrics to describe the amount and distribution of

roads and motorized trails within the action area: open motorized route density

(OMRD), total motorized route density (TMRD), and Core.  FWS23.  "Core" area

is defined as "all areas greater than 500 meters from a motorized route (a road or

trail that is either open to public motorized access and/or is available for

administrative access) or a high-use non-motorized trail, per recommendations

from the Interagency Grizzly Bear Committee (IGBC 1994)."  FWS24.  FWS

found that existing OMRD, TMRD, and Core in BMU 12 meet standards set by the

2011 Access Amendments and incorporated into the 2015 Forest Plan for the

16

Kootenai National Forest, but existing OMRD and TMRD were above (worse than) research benchmarks.  FWS24–25.

FWS then addressed illegal road use in the environmental baseline section of the Project BiOp:

> A private entity's non-compliance with the Forest's access management is an illegal activity. . . . These and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered for describing the environmental baseline.

> Illegal motorized access could occur anywhere in the action area. According to data provided by the Forest from Bear Year 2012 through 2020 monitoring reports (in our files), illegal motorized use was observed in the action area in 2 of the 8 years. This illegal use was not concentrated in any given area and was not chronic in that no single road had observed breaches in multiple years. The Forest asserts that it continues to address illegal motorized access in the action area in a timely manner when it is detected.

> The Yaak Valley Forest Council also provided information to the Forest and the Service regarding their survey of roads in the Knotty Pine project area (YVFC 2021). The report highlighted multiple gated or bermed roads that may have been bypassed by all-terrain vehicles or motorcycles at some time in the past. In addition, a few user-created motor vehicle routes are documented in the report. The report does not document the frequency in which illegal use allegedly occurred. However, the report further corroborates data from the Forest showing that illegal motorized use has occurred in the action area (USFS annual monitoring reports, in our files). The Forest monitors for illegal use and addresses issues in a reasonable and timely manner (email and accompanying documentation from S. Hill, January 3, 2022).

> The mere potential for an ATV or motorcycle to breach a gate or barrier does not prove such use occurs. Gated and bermed/barriered roads are available for public non-motorized use, including walking, bicycling (outside of designated Wilderness), and use by horses and pack stock.

Designs for closures may include considerations to allow non-motorized access around a gate or barrier, such as a narrowed path around a gate or berm. Use of these paths by motorcycles or other vehicles is an illegal action and has not been authorized by the Forest. The Service assumes most Forest visitors abide by the law, and that a gated or bermed road indicates to reasonable members of the public that motorized use is not allowed. In addition, the Forest's Motor Vehicle Use Map (MVUM) provides the legal document to identify roads available for public motorized use. However, some Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal.

During the timeframe in which the Knotty Pine project is proposed, we anticipate illegal use will continue to be spatially disparate and temporary, given the annual monitoring data provided by the Forest documenting when road breaches have occurred in the past and the District's commitment to monitoring, fixing known problems, and documenting those fixes when they occur. While effects to grizzly bears may occur as a result of illegal motorized access, it is the Service's opinion that the location and extent of such effects are not reasonably certain. Information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unpredictable. As such, the Service and the Forest are unable to calculate the extent of effects to grizzly bears, and effects associated with illegal motorized access are not exempted under this BO.

FWS25–26.  After addressing illegal road use in this manner, FWS identified miles of closed, open, and seasonally open National Forest System Roads within the action area and stated that the "existing motorized access condition was determined using the best available information, which includes the Forest's roads database with information regarding closure levels and status, as well as ground-verified information as available."  FWS26.

18

FWS also addressed illegal road use in the cumulative effects section of the

Project BiOp:

> As described in the baseline section above, any private entity's non-compliance with the Forest's access management is an illegal activity. While future illegal use of the Forest via motorized access in areas unauthorized for such use may occur within the action area, such illegal use is not considered a Forest (federal) action. These, and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered for potential cumulative effects. Also described above, while cumulative effects to grizzly bears may occur as a result of illegal motorized access, the information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unknown until such time that illegal use is found. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain from these activities. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most users follow travel regulations and when illegal use is observed or when user-created roads become apparent the Forest corrects the situation as soon as they are able.

FWS50–51.

Plaintiffs argue that the Project BiOp fails to adequately analyze the effects

that illegal roads have on grizzly bears in the Project area.  (Doc. 74 at 20.)  In

particular, they argue that "the Agencies' refusal to consider the presence of illegal

roads in the context of OMRD, TMRD, and Core calculations violates their legal

obligation to provide a detailed discussion of the effects of the action because they

are ignoring an important aspect of the problem, failing to consider the relevant

factors, and failing to consider the best available information, in violation of the ESA and the APA." (Doc. 74 at 21.)

The Court does not disagree with Federal Defendants' general contention that "unauthorized motorized use is not part of the 'effects of the action' analysis because a private entity's non-compliance with the Forest Service's access management is an illegal activity and is, therefore, not part of the proposed 'action,' as defined by the ESA." (*Id.* at 21 n.7 (citing 50 C.F.R. § 402.02).) However, because FWS based its no jeopardy determination for the Knotty Pine Project in part on the conclusion that the Project will not increase OMRD and TMRD levels above Forest Plan standards analyzed in the Forest Plan BiOp, FWS52, the calculations of OMRD and TMRD—and whether those calculations should have accounted for illegal motorized use—remain relevant to Federal Defendants' compliance with the ESA. 50 C.F.R. § 402.14(g)(2)–(4). Additionally, the Court notes that the Forest Plan BiOp expressly ties its expectation of similar amounts and types of future illegal motorized access on the Forest, and thus similar future effects to bears, on the fact that "the Forest will not substantially increase opportunities for illegal use (because of its access management standards that limit increases in roads[).]" FWS1549. By FWS's logic, the Project's temporary increases in OMRD and TMRD may increase opportunities for illegal use and its negative effects on bears, and it is imperative

20

that the agencies follow the law in assessing this issue to reach a valid

determination of the Project's impact on the species.

Federal Defendants argue that they "considered illegal motorized use at

multiple levels before making the decisions at issue." (Doc. 82 at 20.) They

contend that the BAs for the Forest Plan and the Project considered unauthorized

motorized access (*id.* (citing FWS1218–22, 1191–92, 88–89)), and the

environmental baseline and cumulative effects sections for both the Forest Plan

and Project's BiOps also evaluated illegal motorized use (*id.* at 21 (citing FWS23–

27, 50–51, 1484–91, 1549–50)).

As relevant here, the Forest Plan BiOp included language quite similar to

that found in the Project BiOp, but it included greater detail regarding previously

detected breaches and their anticipated effects in its environmental baseline

section. FWS1488–90. For example, the Forest Plan BiOp provided an overview

of data available to the agency regarding breaches of road closure devices based on

USFS monitoring, identified areas with long-term illegal use and explained that

most of those areas were in lower elevations and were not considered secure

habitat due to other existing routes, and explained why preventing or physically

restricting certain types of illegal road use was difficult or impossible (e.g., routes

beginning on private lands or lack of authority to obliterate routes providing

powerline access). FWS1489. In the cumulative effects section, the Forest Plan

BiOp concluded: "Because the Forest will not substantially increase opportunities for illegal use (because of its access management standards that limit increases in roads, as described above), we think that the amount and type of illegal use in the future will be similar, and thus effects to bears will be similar, to what occurred from 2011-2019 (a time in which grizzly bear mortality rates decreased and population trend increased, as described previously in this opinion). Based on past data, we assume the effects to grizzly bears from illegal motorized access will continue to be spatially disparate and temporary and are not likely to collectively cause an adverse effect . . . ." FWS1549.

Federal Defendants argue that, consistent with the IGBC Report's recommendation of identifying and excluding some motorized routes from calculation of OMRD and TMRD and documenting the rationale for exclusion, the Forest Plan BiOp "explains that illegal motorized access 'would most likely result in temporary effects to grizzly bears as opposed to a permanent change in the motorized access conditions because the Forest corrects the situation as soon as they are able.'" (Doc. 82 at 21–22 (quoting FWS1488–99).) Federal Defendants argue that this conclusion "is consistent with the grizzly bear motorized access management regime and grizzly bear science, both of which recognize that grizzly bears respond differently to roads depending on traffic volume, duration, type of use, and other factors." (*Id.* at 22 (citing FWS 1497–1504; FS2339–40, 20464;

Doc. 59 at 21–22).)  In particular, "FWS determined there was no long-term illegal use associated with a single road in the Project area and confirmed that the Forest Service had made repairs to closure devices" and thus "there were no permanent changes to factor into the road density and core calculations."  (*Id.* (citing Doc. 59 at 20–21; FWS 25–27, 50–51).)  In a similar vein, Intervenor-Defendant argues that the court's holding in *Probert* "applies only when road closure failure occurs in such a way that the road is effectively open."  (Doc. 81 at 27–28 (citing *All. For the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020)).)

The first problem with these explanations for FWS's decision is that they are nowhere to be found in the Project BiOp.  Neither the Project BiOp nor the Forest BiOp cites the IGBC's recommendation of identifying and excluding particular routes from calculation of OMRD, TMRD, or Core in their discussions of illegal motorized access; indeed, illegal motorized access is discussed separately, and apparently *after*, baseline OMRD, TMRD, and Core were calculated for each respective area.  *Compare* FWS23–25 (discussing motorized access standards and current OMRD/TMRD/Core status in Project BiOp), FWS1475–79 (discussing motorized access standards in Forest Plan BiOp), *and* FWS1484–85 (discussing current OMRD/TMRD/Core status in Forest Plan BiOp) *with* FWS 25–26 (discussing unauthorized motorized use in Project BiOp) *and* FWS1488–90 (discussing unauthorized motorized use in Forest Plan BiOp).  Neither BiOp states

that known or potential unauthorized motorized access routes were considered for inclusion in route density calculations but ultimately excluded.  To be sure, the Forest Plan BiOp provides some explanation for discounting the potential effects of particular areas or instances of known unauthorized motorized access, FWS1489, but the Project BiOp parrots the apparently boilerplate assertion that has become familiar to the Court in recent years: because unauthorized motorized access is unpredictable, its effects on grizzly bears are unknowable, FWS25–26. The Project BiOp does not provide any indication that FWS considered including unauthorized motorized access routes in OMRD, TMRD, or Core calculations, let alone provide a rationale for excluding those routes from the calculations.  The Court cannot allow the Project to proceed based on Federal Defendants' post-hoc rationalization.  *State Farm*, 463 U.S. at 50.

The second problem with these explanations is that they are contradicted by FWS's stated rationales and the evidence before the agency.  Take first Defendants' permanent vs. temporary roads distinction.  Federal Defendants' contention that lack of long-term use of a single road or repairs to defective closure devices excuses the failure to consider illegal roads in OMRD, TMRD, and Core calculations because "there were no *permanent* changes to factor into the road density and core calculations" (Doc. 82 at 21–22 (emphasis added)) is contradicted by the BiOp's statements that (1) illegal motorized use was observed in the Project

area in two of the eight years for which USFS provided monitoring reports; (2) the Yaak Valley Forest Council's survey of roads in the Project area "highlighted multiple gated or bermed roads that may have been bypassed by all-terrain vehicles or motorcycles at some time in the past" and documented "a few user-created motor vehicle routes"; and (3) "some Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal."  FWS25–26.

To be sure, the Court credits Federal Defendants' assertions that USFS monitors closures and fixes known problems promptly.  FWS26.  USFS's monitoring reports demonstrate considerable effort to monitor closure effectiveness well above its minimum commitments.  FWS1220.  The Court thus accepts on the current record that the use of any particular illegal road is, indeed, temporary.  But the ongoing chronic problem of ineffective closures and unauthorized motorized access is permanent.  *Probert*, 412 F. Supp. 3d at 1203–05 ("Although Defendants are correct that certain *roads* are temporary, they fail to account for overall *increases* that are permanent.").

USFS's closure monitoring reports demonstrate that a small percentage of closures will be breached, even if the precise location or frequency is unknown in any given year until it is discovered.  FWS1220.  USFS even goes to the trouble of documenting breaches of Core, specifically, and the percentage of Core affected by such breaches, in each BMU.  *Id.*  FWS acknowledges, and the information before

25

FWS bears out, that the broader problem of illegal motorized access is a fluctuating but permanent one, even if particular instances are scattered. This case does not involve mere speculation that future closures may not be effective; rather, this case relies upon documented past failures and expected future unauthorized use and thus falls squarely within *Probert*'s reasoning.

Moreover, as Plaintiffs note (Doc. 83 at 12), the record before the agency indicates that "[e]ven occasional human-related vehicle noise can result in continued road avoidance and habitat loss associated with such avoidance." FWS5913–14. And "unpredictable random road use, the kind of use that may occur with administrative use of closed roads, may be even more disturbing to bears that have a negative association with roads" because "[f]emales who have learned to avoid roads may also teach their cubs to avoid roads" and thus "learned avoidance can persist for several generations." FWS5914. Roads located near choice grizzly bear habitats can drive females with cubs to less favorable habitat, "resulting in lower cub survivorship." FWS5914. In sum, the Project BiOp's reliance on the temporally and spatially disparate (and thus purportedly unpredictable) effects of unauthorized motorized use fails to consider an important aspect of the problem and offers an explanation for such failure that runs counter to the detailed evidence gathered and provided by USFS and third parties regarding

26

unauthorized motorized access and closure failures on the Forest, in violation of the APA. *State Farm*, 463 U.S. at 43.

Next, take Defendants' reliance on the IGBC's recommendation to identify and exclude some motorized routes from OMRD, TMRD, and Core calculation. As Plaintiffs note, the Project BiOp's discussion of unauthorized motorized access appears to contradict the IGBC methodology and definitions of motorized routes, which USFS used in its Forest Plan BA, and which the Project BiOp and Forest Plan BiOp expressly incorporate. FWS23, 1477, 1505. The Forest Plan BA explains how USFS identified and coded motorized routes for purposes of calculating OMRD, TMRD, and Core in BMUs. FWS1202–05.

- Impassable roads are "roads not reasonabl[y] or prudently passable by conventional 4-wheeled passenger vehicles, all-terrain vehicles, or motorcycles" and are not included in TMRD, OMRD, or Core calculations. FWS1204.

- Restricted roads are roads "on which motorized vehicle use is restricted yearlong. The road requires effective physical obstruction (generally gated). Administrative motorized use may occur on these roads." FWS1204–05. Restricted roads are included in TMRD and Core calculations, but they are not included in OMRD *unless* administrative use exceeds the allowable

number of trips set forth in the Access Amendments, in which case it will be coded as an open road.  *Id.*

- Reclaimed/obliterated and barriered roads are roads that are "managed with the long-term intent for no motorized use" and have been "treated in such a manner to no longer function as a road," including by recontouring to its original slope, placement of logging or forest debris, obliterating, or putting barriers at the entrance.  FWS1205.  Reclaimed/obliterated and barriered roads are not included in TMRD, OMRD, or Core calculations.  *Id.*

- Open roads are roads "without restriction or having a seasonal restriction on motorized vehicle use," and they are included in TMRD, OMRD, and Core calculations.  *Id.*

- Open motorized trails are trails "that receive motorized use," including "[t]rails used by 4-wheelers, 4-wheel drive vehicles, and motorized bike trails," and they also are included in TMRD, OMRD, and Core calculations. *Id.*

In the Forest Plan BA's discussion of unauthorized motorized access, USFS states:  "To err on the side of the bear and show all potential effects, if illegal motorized access has occurred on a restricted route, the route is analyzed as open for the entire bear year, even if the route may only receive little or short term use." FWS1218.  "Unauthorized use is determined by damage to or removal of the

restriction device, by vegetation and ground disturbance that indicate wheeled

motorized use." *Id.* Based on USFS's extensive monitoring, it concluded that "it

appears that the level of illegal use at approximately 0-8% of closure devices in the

BMUs." FWS1221.

The Project BiOp, by contrast, (1) asserts that because "[i]nformation as to

the length, duration, amount of use, type of use, and location, among other

conditions" of unauthorized motorized use "is and will continue to be

unpredictable," FWS and USFS "are unable to calculate the extent of effects to

grizzly bears"; and (2) dismisses the Yaak Valley Forest Council's survey of routes

in the Project area that FWS acknowledges "may have been bypassed by all-terrain

vehicles or motorcycles at some time in the past" because the report "does not

document the frequency in which illegal use allegedly occurred." FWS25–26.

The Project BiOp provides no indication that the agencies considered including

these routes in OMRD and TMRD calculations as "open motorized trails"; it does

not explain why FWS apparently diverged from USFS's approach of "err[ing] on

the side of the bear" and analyzing routes with evidence of motorized use as open

for an entire bear year "even if the route may only receive little or short term use";

and it provides no explanation why, despite FWS's acknowledgement that

unauthorized motorized access occurs, the agencies could not even attempt to

estimate potential effects by extrapolating from USFS's detailed closure

monitoring data. *See State Farm*, 463 U.S. at 52–54 (rejecting agency's argument that potential impacts of action could not be predicted where record contained empirical evidence agency failed to assess). Thus, even if the Court could accept the agencies' post-hoc reasoning for their treatment of unauthorized motorized access, their explanation runs counter to the evidence before the agency *and* appears to change course from previously applied methods and standards without supplying a reasoned explanation for doing so. *State Farm*, 463 U.S. at 43, 57.

USFS's monitoring and methodology, which are grounded in the IGBC recommendations and Access Amendments standards, demonstrate that the agencies have the capacity to account for fluctuating conditions and new information. The Project BiOp's claim that the agencies simply cannot account for the effects of unauthorized motorized access on grizzly bears therefore runs counter to the evidence before the agencies. *State Farm*, 463 U.S. at 43.

To be sure, the Court does not intend to express any view on how the agencies should account for unauthorized motorized access going forward; the Court must defer to the agencies' expertise on that point. However, the agencies must actually *exercise* that expertise for their decisions to stand. *State Farm*, 463 U.S. at 54. Claiming a total inability to ascertain, or even estimate, effects of unauthorized motorized use on OMRD, TMRD, and Core—and, by extension, the

effects on grizzly bears—despite the evidence in the record supplied by both USFS and third parties does not suffice.

Because the Court concludes that Plaintiff's are likely to prevail on this ESA and APA claim, the Court declines to address Plaintiffs' precommercial thinning claim at this time.

## II.    Likelihood of Irreparable Injury

Plaintiff has established a likelihood of irreparable injury absent injunctive relief.  While irreparable harm cannot be presumed in ESA cases, "establishing irreparable injury should not be an onerous task for plaintiffs."  *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  A district court need not find an extinction-level threat to a listed species before issuing an injunction under the ESA; "[t]he ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species . . . .  Harm to those members is irreparable[.]" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018).

31

## A.     Alleged Injuries

As discussed above, the Knotty Pine Project area lies within the CYE Recovery Zone.  FWS11.  While the parties dispute the estimated current population of grizzly bears within the CYE, the record indicates the number is somewhere between 45 and 60.  FWS17, 1064.  FWS's Grizzly Bear Recovery Plan sets a goal of a minimum population of approximately 100 grizzly bears in the CYE.  FWS5850.  A 2016 peer-reviewed published study found that the Cabinet and Yaak populations were demographically and reproductively isolated from each other, the Cabinet population was highly inbred, and in these populations, "the difference between growth and decline is 1 or 2 adult females being killed annually or not."  FWS3033.  From 1982 to 2020, researchers reported 64 instances of known and probable grizzly bear mortality in and near the CYE, excluding Canada, and found that 46 of the fatalities—72%—were human-caused.  FWS19. Fecundity within the CYE is low; between 2015 and 2020, the CYE contained 2 to 5 adult female grizzly bears with cubs each year, averaging to 3.3 females with cubs per year.  FWS20.  The Project BiOp attributes low fecundity to "the very low abundance in terms of the number of bears."  *Id.*

FWS observed in the Project BiOp that the Yaak River portion of the CYE has experienced gene flow from British Columbia grizzly bear populations, resulting in four offspring thus far.  FWS20.  Intervenor-Defendant also notes that

more recent evidence shows that male grizzly bears have moved from the Selkirk Mountains or the Yaak River into the Cabinet Mountains.  (Doc. 81 at 18 (citing FWS1069).)  However, FWS's 2021 Species Status Assessment for grizzly bears concludes that the CYE population has "low" resiliency, which is defined as "the ability for populations to persist in the face of stochastic events, or for populations to recover from years with low reproduction or reduced survival[.]"  FWS19.  The Project BiOp summarized that "the CYE population has seen improvements over the past few decades but is still a small population in which the survival and reproduction of each individual female grizzly bear is very important."  FWS18.  Despite very recent improvements documented in the record, the CYE population of grizzly bears remains "especially vulnerable."  *Gassmann*, 604 F. Supp. 3d at 1034.

The parties dispute how many bears are known to reside in the Project area, but all acknowledge that the Project BiOp states that one female grizzly bear is known to currently reside in BMU 12, and she was observed in September of 2021 with collared yearling offspring; four other unique females have been observed "over the years" in this BMU.  FWS21, 52.  Researchers have observed females with cubs or young in BMU 12 for five of the last ten years, and at least five different male bears use a portion of BMU 12 south and west of Pine Creek prior to mid-June.  FWS21.

Anthony South, a staff member of Plaintiff Yaak Valley Forest Council,
attests that he resides within the Project area, regularly hikes within the Project
area and enjoys viewing flora and fauna in the areas currently proposed to be
logged, and asserts that the road building and logging authorized by the Project
will "degrade the areas that I find most enjoyable, cause wildlife to flee, harm
streams, increase illegal road usage, and destroy functioning ecosystems." (Doc.
74-1 at 2.) On his and the Yaak Valley Forest Council's members' behalf, he
asserts that logging, burning, road-building, road use, and road reconstruction will
cause ecological and esthetic degradations rendering the area unsuitable for their
activities, including wildlife observation and study, hiking, camping, and quiet
contemplation in nature. (*Id.* at 5.) He further attests:

> If operations are allowed to proceed as planned, the area will be
> irreversibly degraded because once logging occurs, the Forest Service
> cannot put the trees back on the stumps, and our interests in the area
> will be irreparably harmed to the point that the area is no longer
> adequate for our esthetic, recreational, scientific, spiritual, vocational,
> and educational interests. . . . Additionally, regarding our interests in
> grizzly bears, the displacement of grizzly bears during the Project
> duration may cause grizzlies to avoid the area for generations
> afterwards since this type of avoidance behavior is a learned behavior
> that is passed on to cubs. Therefore, if the Project is implemented,
> grizzly bears may not occur in the Project area again during the
> lifetimes of our members.

(*Id.* at 6–7.)

B.    **Imminence of Alleged Harm**

Federal Defendants contend that because "none of the work that Plaintiffs

challenge in their complaint and summary judgment briefing will start until June

15, 2023 at the earliest" and "the Forest Service remains flexible with its schedule"

and will provide 30-days' notice before starting such work, "Plaintiffs have not

shown any imminent irreparable harm." (Doc. 82 at 10–12.) Setting aside

Defendants' subsequent notice of project activities beginning as early as May 26

(Doc. 86), Federal Defendants cite no authority for the proposition that a motion

filed slightly more than two months before logging may begin is insufficiently

imminent, and the Court rejects any such argument. *See Gassmann*, 604 F. Supp.

3d at 1036 (granting preliminary injunction where project activities were scheduled

to begin within three months of plaintiff's motion).

Federal Defendants likewise attack the causal link between "any of the

specific components of the timber sales approved by the Project" and any

imminent harm to Plaintiffs' members' interests in utilizing the area in an

undisturbed state. (Doc. 82 at 12–13.) But commercial logging is not the only

"disturbance" contemplated by the Project or cited by Mr. South. A plaintiff must

show that the requested injunction would forestall irreparable harm but need not

show that the action sought to be enjoined is the exclusive cause of the injury,

particularly where effects on listed species from individual agency actions "cannot

be cleanly divorced from the effects" of broader operations, because "[l]isted species are exposed to the combined operations of the entire system." *Nat'l Wildlife Fed'n*, 886 F.3d at 819–20. The requested injunction would forestall at least one significant logging project and other activities that will alter the landscape. The causal link between such work and harm to Plaintiffs' members' ability to utilize the area in its undisturbed state is not difficult to draw.

**C.    Irreparable Harm to Grizzly Bears**

Federal Defendants argue that the Court cannot use the fact that the agencies expect adverse effects to individual grizzly bears as a proxy for irreparable harm, because in that case, "Plaintiffs could satisfy the irreparable harm prong anytime an action required formal consultation." (Doc. 82 at 14 (citing 50 C.F.R. § 402.14(b).) The Court does not disagree with the principle as Federal Defendants state it, but Plaintiffs' argument is neither as sweeping nor as simple as Federal Defendants characterize it. As discussed above, the record establishes that resiliency of grizzly bears within the CYE is low, fecundity is low because of the small population, and grizzly bears within the CYE still have not met important recovery targets. Under the facts of this case, the record establishes a direct link between adverse effects to individual bears within the CYE and adverse effects on the species. *Nat'l Wildlife Fed'n*, 886 F.3d at 818–20; *see also Gassmann*, 604 F. Supp. 3d at 1033–35; *cf. Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999,

36

1014 (D. Mont. 2018) (noting "isolation and lack of connectivity between grizzly bear populations was a recognized threat at the time of the original listing" of the species).

Federal Defendants also argue that the BiOp observes that the Project's impacts from motorized use "merely had the 'potential' for 'temporary' and 'low level harm' to 'one or two' female grizzly bears in the form of displacement or underutilization of suitable habitat." (Doc. 82 at 15 (citing FWS51, 58, 40, 48).) Federal Defendants argue that Plaintiffs suggest that irreparable harm can be established "by pointing to the potential for temporary non-lethal impacts to one or two individuals of a listed species." (Doc. 82 at 15.) However, Intervenor-Defendant acknowledges that this non-lethal harm includes the possibility that reproduction may be slowed during implementation of the Project for 3-5 bear years, affecting 1-2 reproductive cycles. (Doc. 81 at 20–21 (citing FWS53, 1102).) In a Recovery Zone with low fecundity and low resiliency, FWS19–20, and where FWS itself acknowledges that, in the CYE population, "the survival and reproduction of each individual female grizzly bear is very important," FWS18, the possibility of slowed reproduction in a Project area known to be used by female grizzly bears with young presents a gravely serious and non-speculative risk to both individuals and the species.

37

Federal Defendants distinguish this case from *Gassmann*, arguing that in that case, "the Court rejected the defendants' arguments about the impact of the project's effects because it found the agencies' analyses to be lacking." (Doc. 82 at 16.) But the same logic applies in this case because the Project BiOp's conclusions rely upon deficient analyses because of the agencies' failure to adequately consider known information about unauthorized motor vehicle access. For the same reason, the Court cannot accept Federal Defendants' argument that FWS's "determin[ation] that the Project would not exceed the Forest Plan's motorized access standards for [BMU 12]" means that the species would not be irreparably harmed (Doc. 82 at 16–17); the flaws in Federal Defendants' analyses call that conclusion into question.

Federal Defendants argue that the blanket injunction against the Project Plaintiffs request is not sufficiently narrowly tailored to remedy the specific harm alleged. (Doc. 82 at 17.) But as this Court concluded in *Gassmann*, "effects on listed species from individual agency actions 'cannot be cleanly divorced from the effects' of broader operations, because '[l]isted species are exposed to the combined operations of the entire system.'" 604 F. Supp. 3d at 1036 (quoting *Nat'l Wildlife Fed'n*, 886 F.3d at 819–20). Although Defendants focus primarily on commercial timber activities, of particular concern to the Court are the fuels reduction activities set to begin as early as May, which are located within the

portion of BMU 12 that male bears use "prior to mid-June" according to the
Project BiOp.  FWS21; Doc. 88 at 6.  To the extent the parties can reach agreement
regarding allowing particular activities to proceed, or to the extent Federal
Defendants can demonstrate that particular projects should be carved out of the
injunction, the Court will entertain a motion to modify the scope of the injunction.

Plaintiffs have shown a sufficient likelihood of irreparable harm to their
members' recreational and aesthetic interests, which depend in part upon the health
and presence of the CYE grizzly bear population, stemming from irreparable harm
to those listed species.  *Nat'l Wildlife Fed'n*, 886 F.3d at 822.

### III.  Balance of Equities and the Public Interest

"There is no question, as firmly recognized by the Supreme Court, that the
ESA strips courts of at least some of their equitable discretion in determining
whether injunctive relief is warranted."  *Cottonwood Env't L. Ctr.*, 789 F.3d at
1090.  In particular, the third and fourth *Winter* factors—the balance of equities
and the public interest—"always tip in favor of the protected species."  *Id.* at 1091.
As discussed above, Plaintiffs have proven a likelihood of success on the merits
and likelihood of irreparable harm on their ESA/APA claim concerning FWS's
inadequate analysis of illegal motorized access.  Accordingly, preliminary
injunctive relief is warranted.

Federal Defendants nevertheless argue that the public interest favors allowing the Project to proceed "because it provides numerous ecological benefits to the forest, to wildlife such as the grizzly bear, and to the community." (Doc. 82 at 26.) Additionally, Federal Defendants argue that enjoining the Project will delay ecological and socioeconomic benefits, including reducing the potential for high intensity wildfire and investing in underserved and socially disadvantaged communities. (*Id.* at 26–29.) Federal Defendants' concern about delay of these purported benefits is undercut by the ten-year duration of project activities and the award of only one (currently suspended) commercial timber sale contract so far. (Doc. 72 at 2–3.)

Federal Defendants emphasize the significant public interest in reducing the risk of catastrophic wildfires and critique Plaintiffs' failure to respond to the Project's Fires and Fuels Specialist Report and the science underlying that report. (Doc. 82 at 29–30.) Intervenor-Defendant likewise heavily emphasizes the potential harm to the public and to the Kootenai Tribe specifically from enjoining the Project's efforts to reduce forest fuels and the risk of damaging wildfire after decades of fire suppression resulted in an unhealthy forest ecosystem. (Doc. 81 at 30–32.) Although preventing catastrophic wildfire and promoting a healthier forest ecosystem undoubtedly are in the public interest, the Project's 10-year duration and the relatively modest delay resulting from a preliminary injunction

40

undercuts the urgency Defendants assign to wildfire mitigation as a basis for allowing the entire Project to proceed while this litigation is pending.

Federal Defendants further argue that the balance of equities and public interest favor allowing the Project to proceed because the Project is intended to benefit the grizzly bear by improving habitat conditions.  (Doc. 82 at 31–32.) However, this argument rests on the premise that the Project is not expected to jeopardize the grizzly bear (*id.* at 32), which, as discussed above, is not a reliable conclusion in light of Federal Defendants' failure to comply with the ESA.  *See Nat'l Wildlife Fed'n*, 886 F.3d at 819.

Federal Defendants also cite support from community members for the Project, arguing that "Plaintiffs make no showing that the public supports their efforts to enjoin the Project."  (Doc. 82 at 27.)  The public interest is not synonymous with popularity, and Congress—the branch of government expected to be responsive to the will of the people—made the call many decades ago that protecting listed species was the paramount concern by enacting the ESA. Defendants have not shown that *Cottonwood* should not apply in this case, and the Court concludes that all four *Winter* factors weigh heavily in favor of a preliminary injunction pending resolution of this litigation.

**CONCLUSION**

IT IS ORDERED that Plaintiffs' motion (Doc. 73) is GRANTED.

Defendants are enjoined from implementing the Knotty Pine Project until this case

has reached a decision on the merits.

DATED this 24th day of April, 2023.

Dana L. Christensen, District Judge
United States District Court