IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | CV 22–91–M–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| UNITED STATES FOREST SERVICE, et al., | |
| Defendants, | |
| and | |
| KOOTENAI TRIBE OF IDAHO, | |
| Intervenor-Defendant. | |

Before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 29) and Defendants and Intervenor-Defendant's Cross Motions for Summary Judgment (Docs. 53, 58). For the reasons herein, the Motions are GRANTED IN PART and DENIED IN PART.

## FACTUAL BACKGROUND

### I.    The Knotty Pine Project

The Knotty Pine Project ("the Project") area consists of 56,009 acres located in Lincoln County, Montana, in the Three Rivers Ranger District of the Kootenai

National Forest. FS1015. The Project area includes 48,637 acres of National Forest System lands, 42,823 of which are in the Wildland Urban Interface. FS1015. The Project includes commercial harvest on 2,593 acres, non-harvest fuel treatments (ecosystem and ladder fuel reduction burning) on 4,757 acres, and precommercial thinning on 2,099 acres. FS1015. The Project authorizes a total of 7,465 acres of prescribed burning. FS940. The Project will also add 3.76 miles of an undetermined road to the road system, 1.2 miles of temporary road construction, 35 miles of road maintenance, and 4.04 miles of road storage. FS1015. The timeframe for the Project is approximately ten years. FS1567. The stated purposes of the Project in the decision notice include promoting resilient vegetation conditions by: managing landscape-level vegetation patterns, structure, patch size, fuel loading, and species composition; reducing the potential for high intensity wildfires while promoting desirable fire behavior characteristics and fuel conditions in the wildland urban interface; providing forest products that contribute to the sustainable supply of timber products from National Forest System lands; and enhancing big game winter conditions and improving wildlife forage habitat. FS936–38.

## II.    The Grizzly Bear and the Kootenai National Forest

The grizzly bear was listed as a "threatened" species in the lower 48 states in 1975. 40 Fed. Reg. 41,734 (July 28, 1975). "In 1993, Fish and Wildlife Service

("FWS") promulgated a revised Grizzly Bear Recovery Plan ('Recovery Plan')."
*All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1240 (9th Cir. 2017)
("*Bradford*"). The Project area lies within the Cabinet-Yaak Ecosystem Recovery
Zone ("CYE"). "The CYE is a smaller ecosystem that is still slowly recovering
from being close to historical extirpation" of grizzly bears. FWS6529. The CYE is
a roughly 2,600-square-mile area of primarily federal public lands in northwest
Montana and northeastern Idaho. FWS5850.

The Recovery Plan states that a "minimum of 100 bears is a reasonable
goal" for the Cabinet-Yaak grizzly population. FWS5850. The parties dispute the
estimated number of grizzly bears in the CYE (Doc. 61 at 27–28), but the most
recent population estimate detected a minimum of 50 grizzly bears alive at some
point during 2019, five of which were known to be dead by the time the annual
report was published. FWS1064. Within the CYE, several recovery targets have
not yet been met, including the number and distribution of female grizzly bears
with cubs, and the number of Bear Management Units ("BMUs")[1] (18 out of 22)

---

[1] "BMUs are analysis areas that approximate the lifetime size of a female's home
range, but they are not meant to depict the actual location of female home ranges
on the landscape. BMUs were originally identified for management purposes to
provide enough quality habitat for home range use and to ensure that grizzly bears
were well distributed across each recovery zone (IGBC 1994). Because BMUs
approximate female home ranges, they are an appropriate scale to use for assessing
the effects of proposed actions on individuals for the purposes of Section 7(a)(2)
consultation." FWS6523.

with young. FWS6532. Additionally, habitat standards for motorized route densities have not yet been met in the CYE recovery zone. FWS3018. The Cabinet and Yaak bear populations are demographically and reproductively isolated from each other; the Cabinet population is highly inbred. FWS3018.

There are 17 BMUs associated with the CYE recovery zone. FS1726. Most of the Project lies within BMU 12, but 4,535 acres are outside BMU12. FS1015; FWS6523. "Grizzly bears have used the action area (BMU 12) for decades including multiple male grizzly bears. And importantly, the action area has been an important area for female grizzly bears over the past several decades and has housed multiple reproductive females that have contributed to the CYE population." FWS6536. "Since 2012, researchers have observed at least 4 unique female grizzly bears and 2 unique subadult females in the BMU at some point." FWS6536. In 2021, an adult female was observed in BMU 12 "with collared yearling offspring." FWS6537. In 2022, an adult female with cubs was observed in BMU 12. FWS6536. "As of August 2023, at least one collared female and two collared males have been documented in BMU 12." FWS6542.

## III.    Motorized Access in the Cabinet-Yaak Recovery Zone and Kootenai National Forest

According to the Interagency Grizzly Bear Committee ("IGBC") Taskforce Report, the motorized use of roads poses a threat to grizzly bear habitat. FWS5384.

The management of roads is one of the most powerful tools available to balance the needs of people with those of bears. FWS5384. High road densities in low elevation habitats may result in grizzly bear avoidance or displacement from important spring habitat and high mortality risks. FWS5913–15. Such displacement can have multi-generational effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitat associated with closed roads." FWS5914.

In 2011, the Forest Service approved the Access Management Amendment ("Access Amendment") for grizzly bears in the Cabinet-Yaak ecosystem. FWS4593. The purpose of the Access Amendment was to "include a set of wheeled motorized vehicle access and security guidelines and meet the agency's responsibilities under the Endangered Species Act ("ESA") to conserve and contribute to recovery of grizzly bears." According to the FWS's Biological Opinion for the Access Amendment, the Access Amendment responds to and acknowledges that "a viable road and access management plan is the most important factor influencing the long-term impacts on grizzly bears in habitat influenced by timber harvesting." FWS4729.

The Access Amendments "established motorized-vehicle access restrictions in recovery zones and [bears outside recovery zone ("BORZ"] polygons." *Id.* The

Access Amendments also define how to calculate road densities, including definitions for open motorized route density ("OMRD"), total motorized route density ("TMRD"), and Core (which refers to areas beyond the 500-meter zone of influence[2]). FWS23. TMRD calculations include "open roads, restricted roads, roads not meeting all reclaimed criteria, and all motorized trails." FWS5387. While the 2015 Forest Plan superseded the Access Amendment, the Access Amendment's Road density and core standards were retained in the Kootenai National Forest Plan. FS15.

Within the CYE grizzly bear recovery zone, the Access Amendment sets specific numerical limits on total OMRD and TMRD and requires a specific numeric minimum percentage of secure (i.e., roadless) core habitat in each BMU. FWS4648. The existing OMRD and TMRD are above ("worse than") the research benchmarks in BMU 12. FWS6541. According to the Amended BiOp, FWS "anticipate[s] ongoing significant effects to female grizzly bears" in "BMUs that have standards that exceed (i.e., are 'worse than') the research benchmarks for any of the access metrics." FWS6541. FWS "assume[s] that the ongoing displacement of grizzly bears in areas with higher road densities may be resulting in significant under-use of key habitat at the scale of the home range." FWS6541.

---

[2] The Zone of influence refers to the 500-meter area surrounding both roads and motorized trails that grizzly bears tend to avoid. FWS1497, 1500.

6

The Forest has documented illegal motorized use in the action area in 4 of the 11 years (in the period from 2012–2023). FWS6543.

Additional facts in the record are discussed as they become relevant in the analysis below.

### PROCEDURAL BACKGROUND

This case was originally referred to United States Magistrate Judge Kathleen L. DeSoto. (Doc. 13.) While referred to Judge DeSoto, the Parties filed cross-motions for summary judgment. (Docs. 29, 53, 58.) Before the motions for summary judgment were fully briefed, Plaintiffs filed a motion for preliminary injunction. (Doc. 73.) The undersigned withdrew the referral from Judge DeSoto and preliminarily enjoined the Project. (Docs. 75, 89.) In light of the Court's injunction, FWS issued an Amended Biological Opinion ("Amended BiOp") (Doc. 91-1) "to address the concerns the Court expressed in the Preliminary Injunction Order for the Knotty Pine Project" (Doc. 91 at 2).

Following the issuance of the Amended BiOp, Plaintiffs filed a Second Amended Complaint ("SAC"), now the controlling pleading. (Doc. 107.) The SAC alleges six claims of relief: the Project Environmental Assessment ("EA") violates the National Environmental Policy Act ("NEPA") because it fails to take a hard look at effects to grizzly bears (Claim One); the Project EA violates NEPA, the National Forest Management Act ("NFMA"), and the Administrative Procedures

Act ("APA") because it fails to demonstrate Forest Plan Compliance (Claim Two); the Forest Service's refusal to prepare a full Environmental Impact Statement ("EIS") for the Project violates NEPA and the APA (Claim Three); the Forest Service and Fish and Wildlife Service ("FWS") (collectively, "the Agencies"), must reinitiate consultation on the Kootenai National Forest Plan (Claim Four); the 2023 Knotty Pine Biological Opinion ("Amended BiOp"), Biological Assessment ("the Project BA") and the Kootenai Forest Plan Biological Opinion (the "Forest Plan BiOp") and Biological Assessment ("the Forest Plan BA") are arbitrary and capricious and in violation of the Endangered Species Act ("the ESA") (Claim Five); and the Forest Service and FWS must reinitiate consultation on the Access Amendment (Claim Six). (*Id.* at 50–61.) The parties engaged in supplemental briefing on the motions for summary judgment to address the Amended BiOp and the SAC. The motions are now ripe for ruling.

## LEGAL STANDARDS

### I.    National Environmental Policy Act

A procedural statute, NEPA "prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). While NEPA does not "mandat[e] that agencies achieve particular substantive environmental results," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989), it aims (1) to "place[] upon an agency the obligation to consider every

8

significant aspect of the environmental impact of a proposed action[,]" and (2) "ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process," *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, *Inc.*, 462 U.S. 87, 97 (1983). Thus, a district court's role under NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id*. at 97–98.

While NEPA does "not require agencies to elevate environmental concerns over other appropriate considerations[,]" the agency must "take a 'hard look' at the environmental consequences before taking a major action." *Id*. An agency adequately conducts a "hard look" when it provides "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Taking a "hard look" at the potential environmental consequences "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *League of Wilderness Defs. Blue Mtns. Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (internal quotation marks and citations omitted).

Agencies have "discretion to determine the physical scope used for measuring environmental impacts." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305

F.3d 957, 973 (9th Cir. 2002). "[T]he central principle of judicial review in NEPA cases" is "deference." *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1511 (2025). The court's review under the arbitrary and capricious standard is "whether the agency action was reasonable and reasonably explained." *Id.*

## II.    National Forest Management Plan

NFMA sets forth "a two-stage approach to forest planning." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996). In the first stage, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]" 16 U.S.C. § 1604(a). Land and resource management plans (LRMPs) "guide sustainable, integrated resource management" and promote forest lands that are "ecologically sustainable and contribute to social and economic sustainability" and that "consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities[.]" 36 C.F.R. § 219.1(b), (c). In developing LRMPs, the Secretary must comply with NEPA. 16 U.S.C. § 1604(g)(1).

In the second stage, the LRMPs are directly implemented as projects are proposed and assessed. *Inland Empire Pub. Lands Council*, 88 F.3d at 757; *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512 (9th Cir. 1992). Any

proposed projects, permits, resource plans, or other instruments allowing use and

occupancy of the forest lands must be consistent with the provisions of the

LRMPs. 16 U.S.C. § 1604(i); *Inland Empire Pub. Lands Council*, 88 F.3d 754 at

757. "A project is consistent if it conforms to the applicable 'components' of the

forest plan, including the standards, guidelines, and desired conditions that are set

forth in the forest plan[.]" *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d

1105, 1110 (9th Cir. 2018). The Court gives "substantial deference" to the "Forest

Service's interpretation and implementation" of the LRMP. *Native Ecosystems*

*Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). However, the Forest

Service's failure to comply with the LRMP constitutes a violation of NFMA. *Id.*

### III.    Administrative Procedure Act

Because NEPA does not create a cause of action, NEPA claims are reviewed

under the Administrative Procedure Act. *Native Ecosystems Council v. Dombeck*,

304 F.3d 886, 891 (9th Cir. 2002). The APA requires a reviewing court to hold

unlawful and set aside an agency's decision if it is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"[R]eview under the arbitrary and capricious standard is narrow, and [a court

should] not substitute [its] judgment for that of the agency." *Earth Island Inst. v.*

*U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (citations and quotation

marks omitted).

A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Although . . . review under the arbitrary and capricious standard is deferential, an agency's finding of no significant impact is arbitrary or capricious if the petitioner has raised substantial questions whether a project may have a significant effect on the environment." *Blue Mtns. Biodiversity Project v. Jeffries*, 99 F.4th 438, 447 (9th Cir. 2024).

## IV.   Endangered Species Act

The ESA declares a national policy of conserving endangered and threatened species. 16 U.S.C. § 1531(c). In enacting the ESA, Congress intended to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). In doing so, Congress adopted an approach of "institutionalized caution" that affords endangered species "the highest of priorities," even over the primary missions of federal agencies. *Id.* at 185, 194. To accomplish its purpose, the ESA requires that all federal agencies "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section

referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2).

The ESA mandates that federal agencies request information from the Secretary of the Interior on the potential presence of species listed or proposed to be listed as threatened or endangered in the area of the proposed agency action. 16 U.S.C. § 1536(c)(1). The ESA's implementing regulations likewise require federal agencies to convey to the Director of FWS "either (1) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area; or (2) a written notification of the species and critical habitat that are being included in the biological assessment." 50 C.F.R. § 402.12(c). If such species may be present in the area, the agency must prepare a BA to identify any endangered or threatened species that is likely to be affected by the agency's proposed action. 16 U.S.C. § 1536(c)(1).

If the BA concludes that the proposed project is likely to adversely affect a listed species, the action agency must then engage in informal or formal consultation with FWS. *Forest Guardians v. Johanns*, 450 F.3d 455, 457–58 (9th Cir. 2006). If the agency concludes in the BA or through informal consultation that the action is not likely to adversely affect a listed species or critical habitat, and FWS concurs, the consultation process ends as to that species. *See* 50 C.F.R. §

13

402.14(b)(1). Otherwise, formal consultation must commence, which requires FWS to issue a BiOp evaluating the effects on the listed species and making a "jeopardy" or "no jeopardy" determination. *Id.* § 402.14(h)(iv). If the BiOp concludes that the proposed action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," the BiOp must also propose reasonable and prudent alternatives and measures that could minimize or avoid the adverse effects. *Id.* at § 402.14(g)(5), (h)(2).

## V.    Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the party opposing the motion must present specific facts, supported by admissible evidence, showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49; Fed. R. Civ. P. 56(e). In cases involving the review of final agency determinations under the APA,

14

review is limited to the administrative record. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985) (when reviewing a decision of an administrative agency, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did").

## ANALYSIS

### I.    Illegal Road Use (Claims One, Two, and Five)

Claims One, Two, and Five are based on illegal road use within the Project area. The Parties' arguments require the Court to conduct a review of the applicable caselaw.

In 2013, Alliance for the Wild Rockies ("AWR") challenged the Pilgrim Creek Timber Sale Project, arguing that it would create a net increase in linear miles of total roads in the Clark Fork BORZ polygon, in violation of the standards set by the Access Amendments. *Bradford*, 856 F.3d at 1240. This Court enjoined the Pilgrim Project Case pending preparation of a supplemental EIS. *Id.* The Court lifted the injunction after the Forest Service issued a Clarification/Amendment of the record of decision, which stated that all new permanent road segments and all new roads constructed for the project would be made impassable to motorized vehicles with the installation of an earthen barrier, rocks, or other barrier after completion of harvest-related activities. *Id.* at 1241–42. The Ninth Circuit affirmed

that decision, holding that "it was not arbitrary and capricious for the Forest
Service to conclude that roads closed to motorized access by berms or barriers do
not count toward 'linear miles of total roads'" as defined by the relevant standard
set by the Access Amendments. *Id.* at 1242–43. The court of appeals rejected
AWR's argument that the Forest Service's contemplated berms would not
effectively prevent motorized use of the new roads by all-terrain vehicles because
there was no record evidence refuting the Forest Service's assertion that berms
would effectively prevent motorized use. *Id.* at 1243. However, the court cautioned
that "any closure that fails to effectively prevent motorized access" would fail to
comply with the applicable Access Amendments standard. *Id.* The court further
noted that "closure only by gates" that allowed access to the road for maintenance
and other purposes "clearly did not comply with the manner and degree of closure
required by" the Access Amendments standard at issue. *Id.*

In 2018, AWR again challenged the Pilgrim Project, and AWR proved that
"ineffective closures have contributed to increases in linear road miles and
potentially impacted grizzly bears in ways not previously considered." *Alliance for
the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1195 (D. Mont. 2019)
("*Probert*"). Accordingly, this court ordered Defendants to reinitiate consultation
on both the Access Amendments and the Pilgrim Project. *Id.* As relevant here, the
defendants in that case conceded that the Access Amendments did not directly

16

reference temporary mileage increases caused by ineffective road closures, but they argued such effects were considered because the Access Amendments contemplated temporary increases in road miles for other reasons, such as temporary roads constructed to access harvest units. *Id.* at 1204. They further "emphasize[d] the ephemeral nature of ineffective closures, asserting that once discovered, breaches are typically repaired by the next bear year." *Id.* (internal quotation omitted). But the Court agreed with AWR that temporary road use contemplated by the Access Amendments was different in kind from illegal use precipitated by ineffective closures because the former was regulated, while the latter was not. *Id.* at 1204–05. The Court further concluded that "while a single breach may itself be temporary, the Forest Service's annual monitoring reports indicate consistent unauthorized use. Thus, at a minimum, illegal temporary use appears to impact grizzly bears 'in a manner . . . not previously considered . . . .'" *Id.* at 1205 (quoting 50 C.F.R. § 402.16(b)). The Court thus required reinitiation of consultation on the Access Amendments. The Court likewise required reinitiation of consultation on the Pilgrim Project because it was tiered to the Access Amendments, and "the continued uncertainty as to the scope of illegal use" outweighed USFS's insistence that ineffective closures were considered in concluding that baseline total linear mileage levels would not be exceeded. *Id.* at 1206.

Next came *Alliance for the Wild Rockies v. Marten*, 464 F. Supp 3d 1169 (D. Mont. 2020) ("*Marten*"). In that case, the plaintiffs challenged the federal defendants' compliance with the Health Forest Restoration Act, arguing that the Willow Creek Project did not comply with requirements that no new permanent roads be established and that temporary roads be decommissioned within three years. *Id.* at 1175. The Court rejected this argument and distinguished the case from *Probert*, which "dealt with documented historic road closures"; in *Marten*, the plaintiffs only "speculate[d] that the Willow Creek Project's temporary roads will not be effectively obliterated in the future," and the Court found plaintiffs' position "untenable" because it would apply to all projects "based on the mere possibility that planned road closures will be ineffective." *Id.* at 1176.

Subsequently, in 2023, this Court issued a preliminary injunction against the Ripley Project in *Alliance for the Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022 (D. Mont. 2022) ("*Gassman*"). The Ripley Project area was approximately two miles from the CYE Recovery Zone and less than one mile from the Cabinet Face BORZ area. *Id.* at 1027–28. The locations of at least three radio-collared male grizzly bears had been recorded within the project area in the preceding five to seven years. *Id.* at 1028. The agencies in that case relied upon a "worst-case scenario" assumption for all state and private lands within the project area for purposes of the environmental baseline and assumed that those lands would

provide no secure habitat for grizzly bears; accordingly, they argued, FWS did not need to know or mention specifics of known ongoing or future timber harvest and motorized access on state and private lands in the project's biological opinion. *Id.* at 1031–32. The problem with that assumption was that it was concededly false; the agencies acknowledged facts in the record that grizzly bears within or near the project area primarily used private lands. *Id.* at 1032. The Court held that FWS's decision not to obtain or disclose data concerning reasonably certain future state and private activities, and the agencies' decision to rely on factual assumptions they knew to be incorrect in assessing the Ripley Project's cumulative effects on the grizzly bear, violated the ESA and were arbitrary and capricious. *Id.*

Early in the litigation in this case, the Court issued a preliminary injunction. (Doc. 89.) The Court found that Plaintiffs were likely to succeed on the merits of their ESA claim challenging Defendants' failure to adequately consider the impacts of unauthorized motorized access. (*Id.* at 11.) In doing so, the Court rejected Defendants' contention that "lack of long-term use of a single road or repairs to defective closure devices excuses the failure to consider illegal roads in OMRD, TMRD, and Core calculations because 'there was no permanent changes to factor into the road density and core calculations.'" (*Id.* at 24.) The Court explained that it did "not intend to express any view on how the agencies should account for unauthorized motorized access going forward; the Court must defer to

19

the agencies' expertise on that point. However, the agencies must actually exercise that expertise for their decisions to stand." (*Id.* at 30–31.)

Four months after the Court's issuance of a preliminary injunction in this matter, Judge Donald W. Molloy of this Court analyzed the legality of the Black Ram Project in the Kootenai National Forest. *CBD v. USFS*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ("*Black Ram I*"). The Black Ram Project area is located within the Cabinet-Yaak Ecosystem Recovery Zone—one of the six recovery zones the FWS identified to evaluate grizzly bear recovery in the contiguous United States. *Id.* at 1065. As Judge Molloy highlighted, the Black Ram Project, like the Knotty Pine Project, is subject to the Kootenai National Forest Access Amendment. The Court found that Forest Service failed to comply with the Access Amendment because it: (1) intentionally ignored illegal, unauthorized road use in its road density calculations; (2) failed to disclose its methodology for calculating its compliance with the Access Amendment; and (3) impermissibly relied on the assumption that road barriers are 100% effective. *Id.*

The Ninth Circuit issued a memorandum disposition in *Black Ram* affirming Judge Molloy's order granting summary judgment to Plaintiffs on their NFMA and NEPA claims. *Ctr. for Biological Diversity v. United States Forest Serv.*, 2025 WL 586358 (9th Cir. Feb. 24, 2025) ("*Black Ram II*"). The Ninth Circuit explained, in relevant part:

20

[B]ecause the extent to which the Forest Service included unauthorized road use in its core habitat and road density calculations is unclear, it is impossible to discern from the record whether the project has complied with Access Standard 2.

The Access Amendments do not differentiate between authorized and unauthorized road use, nor does a plain reading of the relevant definitions for road density metrics suggest that unauthorized road use can be excluded from core habitat and road density calculations. Rather, the Access Amendments' Road density definitions explicitly contemplate the effectiveness of road closures and actual functionality of roads. Therefore, the Forest Service may not exclude categorically documented unauthorized road use. *See All. for Wild Rockies v. Bradford*, 856 F.3d 1238, 1243 (9th Cir. 2017) (explaining that "any closure that fails to effectively prevent motorized access also fails to comply with [Access Standard 2]").

*Id.* at *12–13.

While *Black Ram I* was on appeal, United States Magistrate Judge Kathleen L. DeSoto of this Court issued Findings and Recommendations in *Swan View Coal. v. Haaland*, 2024 WL 1509347 (D. Mont. Mar. 11, 2024) ("*Swan View*"). In *Swan View*, Plaintiffs challenged the Forest Service's replacement of the Flathead National Forest Land Management Plan with a "Revised Plan." 2024 WL 1509347 at *2. [3] The Flathead National Forest

---

[3] *Swan View* was the second case Plaintiffs brought challenging the Revised Plan. In the first case, *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855 (D. Mont. 2021), Judge Molloy held—in relevant part—that the Revised Plan violated the ESA to the extent that it failed to consider impacts to grizzly bears due to its departure from Amendment 19's road density and reclamation standards. FWS filed a superseding revised BiOp and the Ninth Circuit correspondingly vacated the portions of Flathead that relied on the original BiOp.

was formerly subject to Amendment 19, which set forth road density and road reclamations standards to support the grizzly bear population. Under the Revised Plan, impassable roads no longer counted toward TMRD as long as the road was inaccessible to wheeled vehicles during the bear's non-denning season. *Id.* at 6–7. FWS's Revised BiOP concluded that "illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect," and "a change to the metrics used . . . to assess baseline access conditions would not occur as such use was not authorized, carried out, or funded by the Forest," and would likely only "result in short-term, temporary effects to grizzly bears as opposed to a permanent change in access conditions." *Id.* at 7.

Plaintiffs argued, as tangentially relevant here, that FWS violated the ESA by disregarding harms to grizzly bears caused by unauthorized motorized use. *Id.* at 6. Judge DeSoto found that the Revised BiOp's no-jeopardy determination was foreclosed by the Undersigned's preliminary injunction opinion in this matter. *Id.* Judge DeSoto concluded that there remains an open "question of how to incorporate a meaningful analysis of unauthorized use into road density calculations. . . . Although the specifics of this calculation remain unclear, what is clear from the caselaw is the

general rule that road density calculations must include a material quantification of unauthorized motorized use." *Id.* at 9.

In rejecting Defendants' objections to Judge DeSoto's findings and recommendation concerning unauthorized use, the Undersigned made the following modification: "The Court does not hold that FWS *must* incorporate unauthorized motorized use into any road density calculations; rather, it must decide *whether* to incorporate unauthorized motorized use into road density calculations and *support* its decision with the best available science." *Swan View Coal v. Haaland*, 2024 WL 3219206, at *11 (D. Mont. June 28, 2024).

With the above precedent at mind, the Court turns to the merits of the NEPA, NFMA, and ESA claims.

## A. ESA and APA (Claim Five)

In an attempt to remedy the Court's concerns regarding a lack of consideration of illegal road use, FWS issued an Amended BiOp for the Project. In the Amended BiOp, FWS conducted a "qualitative analysis" of the effects of illegal road use on grizzly bears in the Project area. The Amended BiOP explains:

> Including illegal motorized use in the Forest's calculations of access metrics is inappropriate because (1) there are no indications of site-specific, chronic illegal motorized access on any given roads in the action area, (2) it is not likely that female grizzly bears and their dependent young have encountered illegal motorized use, (3) it is not possible to accurately capture and quantify necessary information as to

23

the extent, duration, and frequency with which illegal motorized use has occurred on specific routes, and (4) illegal use is an unauthorized activity.

FWS006549.

Plaintiffs argue that FWS's "qualitative analysis" is arbitrary and capricious and in violation of the ESA. (Doc. 110 at 6.) Plaintiffs contend that FWS's justifications to exclude known illegal roads in calculations contradict Court precedent, FWS's "qualitative analysis" is unsupported and contrary to the best available science, and FWS's justifications for excluding illegal roads in calculations are similarly arbitrary. (*Id.* at 8–11.) Plaintiffs are correct.

This Court has repeatedly held that it is arbitrary and capricious to not include illegal motorized use that it knows to occur into calculations, regardless of whether the use is chronic and site specific. (Doc. 89 at 26–27); *Black Ram I*, 687 F. Supp. 3d at 1082. Here, the record shows that FWS and the Forest Service are aware of illegal motorized use. *See, e.g.*, FWS6543 ("Illegal motorized access has occurred on the Forest and in the action area."); *see also* FWS6544 (The Yaak Valley Forest Council report "further corroborates data from the Forest showing that illegal motorized access has occurred or has allegedly occurred in the action area in at least a few areas.").

This Court has likewise rejected the claim that it is "not feasible" to include illegal roads in calculations because it is "difficult . . . to determine whether any

24

deviations from the metrics required by Forest Plan standards were due to authorized Forest actions or from illegal actions," FWS6548. (*See* Doc. 89 at 30 ("USFS's monitoring and methodology, which are grounded in the IGBC recommendations and Access Amendment[] standards, demonstrate that the agencies have the capacity to account for fluctuating conditions and new information.").)

FWS asserts that including known illegal road use in calculations "would [] require making unsupported assumptions," due to the unknown "number of vehicle trips, the distance traveled, and the precise location of illegal motorized use." FWS6546. But the Court has rejected this excuse also. (Doc. 89 at 24.) And for good reason: by excluding illegal roads, FWS makes an "unsupported assumption" that illegal roads have no effect on grizzly bears. Such an assumption fails to "err on the side of the bear." FWS1218.

Ultimately, FWS's qualitative analysis does not resolve the Court's concerns that led to the preliminary injunction. Rather, the qualitative analysis appears to rehash positions that have previously been rejected as arbitrary and capricious by this Court. Importantly, FWS cites no scientific support for the novel "qualitative analysis" approach. Defendants contend that "[t]he Amended BiOp is [] consistent with the IGBC Guidelines, which recognize that some motorized access routes could be excluded from the calculations if a 'rationale for exclusion is

25

documented.'" (Doc. 117 at 16–17 (quoting FWS5387).) But here, the only rationale provided in the Amended BiOp for excluding motorized access from the calculations is rationale that has been rejected by this Court and the Ninth Circuit.

The IGBC Guidelines, which Defendants cite as authority supporting their decision to exclude motorized access routes, actually contradict their position. As noted above and detailed in the Amended BiOp, FWS6538, the IGBC Guidelines provide definitions for OMRD, TMRD, and Core. The Access Amendment, incorporated into the Forest Plan, uses the IGBC road density definitions. FWS6538. The IGCB requires an analysis of road densities when determining effects of an action on grizzly bears. FWS6539–40. These TMRD analysis must include any road not "effectively" reclaimed/obliterated, including roads with breached barriers or new user-created roads. FWS5386. The Amended BiOp fails to acknowledge that excluding these roads contradicts the IGBC Guidelines and the Forest Plan's Access Amendment.

While Defendants correctly highlight that FWS is entitled to deference, deference is not warranted when an agency's decision is arbitrary and capricious or contrary to law. The Amended BiOp's continued failure to include illegal road use in its metric calculations of TMRD, ORD, and Core violates the ESA and APA. Plaintiffs are therefore entitled to summary judgment on Claim Five as it relates to the exclusion of illegal roads in its density and core calculations.

26

### B. NEPA and NFMA (Claims One and Two)

Plaintiffs are entitled to summary judgment on their NEPA and NFMA claims as they relate to illegal roads for similar reasons.

Plaintiffs argue that the Forest Service fails to adequately consider the impacts of known illegal roads on the Project area, in violation of NEPA and NFMA. (Doc. 30 at 26.) Specifically, Plaintiffs contend that under NEPA and NFMA, illegal roads must be factored into road density calculations in order to comply with the Access Amendment. (*Id.*)

In response, Federal Defendants argue that illegal road access was considered in the Forest Service's environmental analysis and is consistent with the Forest Plan. (Doc. 59 at 31.) Federal Defendants focus on the fact that "[i]n the EA, the Forest Service noted that the use of closed roads is illegal, that monitoring of illegal use is ongoing, and conducted by Forest Service personnel, and that when the need for gate or barrier repairs are identified, the need is tracked, and the repairs are completed as soon as possible." (Doc. 59 at 31.) But Federal Defendants again miss the mark.

As this Court has held, the failure to consider ineffective closures and illegal roads requires additional NEPA review in order to adequately analyze the impacts of illegal roads on grizzly bear. *Probert*, 412 F.Supp.3d at 1208. As Judge Molloy thoroughly explained in *Black Ram I*,

27

> Because the USFS does not include illegal motorized road use that it knows occurs into its calculations, the Court is being asked to "chisel that which must be precise from what the agency has left vague and indecisive. Therefore, the USFS's decision was "arbitrary and capricious insofar as it assumes the effectiveness of closure devices; claims inability to account for the effects of unauthorized motorized access despite [the USFS's] monitoring and databases, which demonstrate capacity to account for fluctuating conditions and new information; and fails to account for inaccuracies in how roads are classified in the USFS's database despite data showing differing on-the-ground conditions."

687 F. Supp. 3d at 1082 (quoting *All. for the Wild Rockies v. Marten*, 685 F. Supp. 3d 971, 987 (D. Mont. 2023)).

Nevertheless, here, the Forest Service continues to exclude illegal roads from its density calculations. Defendants contend that "the 'mere potential' that illegal motorized access could occur is not enough to conclude that it has occurred," because "NEPA requires agencies take a 'hard look' at environmental impacts, but [it] 'does not require the impossible.'" (Doc. 59 at 24 (quoting *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77 (D.D.C. 2019)).) However, as explained in *Bradford*, 856 F.3d at 1245, and *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1023, 1035–37 (9th Cir. 2018), the Access Amendment requires roads with ineffective barriers to be counted in total road calculations.

Defendants unpersuasively argue that the Amended BiOp complies with *Bradford* and *Probert*. (Doc. 117 at 19–21.) As to *Bradford*, Defendants highlight the Ninth Circuit's explanation that it was not arbitrary and

capricious for the Forest Service to conclude that roads which are "closed immediately upon completion of activities with a berm, guardrail or other measure that *effectively* prevents motorized access" "do not count toward 'linear miles or total roads.'" (*Id.* at 19–20 (quoting *Bradford*, 856 F.3d at 1241–43).) Plaintiffs suggested that all-terrain vehicles could circumvent the berms and access the roads, but because plaintiffs did not provide any evidence to refute the assertion that the berms were effective, the Ninth Circuit took the Forest Service at its word. *Bradford*, 856 F.3d at 12413.

> Here, as the Court has already pointed out:

> [The Forest Service's] closure monitoring reports demonstrate that a small percentage of closures will be breached, even if the precise location or frequency is unknown in any given year until it is discovered. FWS1220. FWS acknowledges, and the information before FWS bears out, that the broader problem of illegal motorized access is a fluctuating but permanent one, even if particular instances are scattered. This case does not involve mere speculation that future closures may not be effective; rather, this case relies upon documented past failures and expected future unauthorized use.

(Doc. 89 at 25–26.)

The Court gives "substantial deference" to the "Forest Service's interpretation and implementation" of the Forest Plan. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). However, here, like in *Black Ram*, Forest Service's failure to comply with the Access Amendments, which are incorporated into the Kootenai Forest Plan, constitutes a violation of NFMA. The

EA's failure to disclose how the Project complies with the Access Amendments and the Forest Service's failure to ensure that the Project is consistent with the Access Amendments violates NEPA's "hard look" mandate.

Likewise, because in excluding unauthorized road use from the density and core calculations, the Forest Service "rel[ied] on incorrect or assumptions or data" and failed to "provide 'accurate' data 'to the public to substantiate its analysis and conclusions,'" the agency failed to take a "hard look" at the environmental impacts of the Project in violation of NEPA. *Black Ram I*, 87 F. Supp. 3d at 1080 (quoting *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 926 (9th Cir. 2015)).

### C. Swan View

Federal Defendants focus significant attention on this Court's clarification in *Swan View*, in which the undersigned stated, "The Court does not hold that FWS *must* incorporate unauthorized motorized use into any road density calculations; rather, it must decide *whether* to incorporate unauthorized motorized use into road density calculations and *support* its decision with the best available science." (Doc. 117 at 8.) But *Swan View*, of course, addressed ESA challenges in the Flathead National Forest, which is not subject to the Access Amendments that bind the Kootenai National Forest.

30

Further, having now seen a "qualitative analysis," the Court is unconvinced that anything short of a quantitative analysis would comply with the Access Amendments and Kootenai Forest Plan. To the extent the Court's analysis in this matter constitutes a shift in direction, the Undersigned's view has evolved to be in line with the Judges within this District and the Ninth Circuit.

## II.    Amount of Take (Claim Four)

Plaintiffs assert that the agencies must reinitiate ESA consultation on the Kootenai National Forest Plan because the amount of take has been exceeded. (Doc. 30 at 37.)

ESA section 9 requires that any "take" of a listed species complies with either (1) an ITS under Section 7 or (2) an Incidental Take Permit under Section 10. 16 U.S.C. §§ 1536(b)(4), (o)(2); 1538; 1539. Where "the amount or extent of take specified in the incidental take statement is exceeded," "reinitiation of consultation is required." 50 C.F.R. § 402.16(a).

Here, FWS's ITS provides that "[i]n order to be exempt from the prohibitions of section 9 of the Act, the Forest must comply with the following terms and conditions that implement the reasonable and prudent measures described above and outline reporting and monitoring requirements." FWS1567.

31

FWS describes these terms and conditions as "non-discretionary." FWS1567. The

2020 Forest Plan BiOp and ITS sets forth the following terms and conditions:

> When managing wheeled motorized access, the [Kootenai National
> Forest] shall use devices or methods on restricted roads and
> reclaimed/obliterated roads that are, at a minimum, consistent with the
> devices or methods recognized by the IGBC.
> . . .
>
> If any access restriction devices or methods are found to be ineffective,
> the [Kootenai National Forest] shall attempt to remedy the situation
> (i.e., respond with an appropriate fix) as soon as practical within the
> same bear year, or no later than the following bear year.

FWS1567. The IGBC Report defines "reclaimed/obliterated road" as:

> a route which is managed with the long term intent for no motorized
> use, and has been treated in such a manner so as to no longer function
> as a road. An effective means to accomplish this is through one or a
> combination of several means including: recontouring to original slope,
> placement of logging, or forest debris, planting of shrubs or trees, etc.

FWS5386.

The Yaak Valley Forest Council provided the Forest Service with surveys

that the Council believed showed illegal roads and evidence of unauthorized

motorized use. FS7293–406; FS8695. Nonetheless, Federal Defendants argue that

"[t]he Forest Service has not exceeded the Forest Plan's standards in the ITS

because Federal Defendants both determined that the Project is consistent with the

Forest Plan's road density and core parameters for BMU 12." But, as noted above,

Federal Defendants' determination regarding road density and core are lacking

32

important data—specifically, unauthorized motorized use—and therefore cannot be used to support Federal Defendants' position.

The Court must defer to the Forest Service's interpretation of its own obligation to comply with Forest Plan requirements, unless the interpretation is "plainly inconsistent with the regulation at issue." *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). As discussed above, the Forest Service's interpretation of the Forest Plan requirements is indeed "plainly inconsistent" with the regulation at issue. Therefore, Plaintiffs are entitled to summary judgment on Claim Four.

### III.    Precommercial Thinning and Grizzly Core Habitat (Claims One and Six)

Next, Plaintiffs argue that "The Project appears to allow motorized use in core [grizzly bear habitat] without any NEPA or ESA analysis." (Doc. 30 at 41.) Plaintiffs contend that "[t]he majority of precommercial thinning units are in designated grizzly bear core[,] and therefore[,] are not accessible by currently open or restricted roads." (*Id.*) According to Plaintiffs, the EA's failure to disclose how the precommercial thinning units will be accessed and how such access will impact TMRD, OMRD, and Core, constitutes a failure to demonstrate compliance with the Access Amendment in violation of NEPA and NFMA. (*Id.* at 42–44.) In addition, Plaintiffs assert that "the Agencies fail to disclose how much core will be impacted

33

or lost" and "the effects to grizzly bears that will result from this loss of core," in violation of the ESA and the APA. (*Id.* at 44–48.)

As a threshold matter, Defendant-Intervenors argue that Plaintiffs' NEPA claim as to precommercial thinning and grizzly core habitat is barred because Plaintiffs "failed to exhaust their administrative remedies." (Doc. 54 at 35.) Specifically, according to Defendant-Intervenors, because Plaintiffs "failed to raise the issue of access to precommercial thinning units in their comments and objections," they "waived their ability to challenge it here." (*Id.*)

"Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *DOT v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978)). "Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met."

Here, Plaintiffs alerted the Forest Service to their concerns in several instances. *See* FS7896 ("The action threats to displace a high percentage of grizzly bears in the Yaak ecosystem from existing core habitat"); FS7857 ("The project proposes to 'impact,' that is, degrade habitat, in the existing core in BMU 12. We

34

request no logging or road construction in Core"); FS8718 ("[T]he Forest Service fails to disclose the total BMU acreage within the project area or discuss how much of the BMU will be affected by proposed vegetation treatments . . . [and] fails to disclose how many acres of secure Core would be treated under the proposed action"). The Court rejects the notion that Plaintiffs must "incant the magic words ['pre-commercial thinning'] in order to leave the courtroom door open." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002). As such, the Court turns to the merits of claim.

Defendants collectively argue that the Forest Service's analysis of the Project-related road use satisfied NEPA. (Docs. 54 at 36; 59 at 43.) The Court agrees. Importantly, the precommercial thinning treatments "will be conducted by hand crews using chainsaws accessing the area primarily by open roads." FWS36–37, 367. Further, a thorough review of the Project map, FS1032, reveals that the precommercial thinning unites are all less than one- and one-half miles from open roads and are accessible to laborers without the need for additional motorized use. (Doc. 59 at 45.)

Plaintiffs' pre-commercial thinning ESA claim fairs no better. Plaintiffs allege that Federal Defendants did not consider precommercial thinning during the ESA consultation. (Doc. 30 at 48.) However, the BiOp explains:

> Precommercial thinning activities ["PCT"] will occur in Core areas. There are about 29 units of PCT treatments that overlap Core.

35

> Treatments will be conducted by hand crews using chainsaws accessing the area primarily by open roads (S. Hill, email communication, January 2022). The primary effect from these activities to grizzly bears are a result of people and equipment operating in grizzly bear habitat as well as the effects of roads used to access the timber stand (USFWS 2020, p. 78). Bears are likely to move away from the temporary disturbance while thinning activities take place to access resources. We expect the BMU will continue to provide sufficient Core areas adjacent to the PCT units for grizzly bears affected by the proposed action and could be used as an escape during the treatments.

FS1679–80. Likewise, the Project BA considers the impact of precommercial thinning activities in Core areas, and the impact of those activities on grizzly bears. FWS36–37. The administrative record supports the finding that Federal Defendants thoroughly considered precommercial thinning under the ESA. As such, summary judgment must be granted in favor of Defendants as to Claims One and Six as they relate to the Project's commercial thinning activities.

## IV.    Cumulative Impacts (Claim One)

Plaintiffs argue that the Forest Service must conduct "a cumulative impacts analysis of 'other past, present, and reasonably foreseeable future actions' in the Project EA." (Doc. 30 at 48 (quoting C.F.R. § 1508.7).) That analysis, according to Plaintiffs, "must be 'more than perfunctory,' and requires 'some quantified or detailed information; . . . [g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." (*Id.* (quoting *Kern v. BLM*, 284 F.3d

1061, 1075 (9th Cir. 2002) and *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d

1372, 1379–80 (9th Cir. 1998)).)

Following the completion of supplemental briefing in this matter, the United

States Supreme Court issued its opinion in *Seven County*. In *Seven County*, the

Court reiterated that:

> In analyzing those scope questions, it is critical to disaggregate the agency's role from the court's role. So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line—including (i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand. On those kinds of questions, as this Court has often said, agencies possess discretion and must have broad latitude to draw a "manageable line."
>  . . .
>
> When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.

*Id.* at 1513.

Here, according to the Forest Service, "[t]here are no other current or

planned large-scale Forest Service vegetation management projects in the Project

Area that would impact grizzly bears or their habitat." FS2360. While Plaintiffs

claim that the Wildlife Report "entirely fail[s] to disclose that the active Buckhorn

Project" shares a boundary with the Knotty Pine Project (Doc. 30 at 49–50), the

Forest Service discusses the Buckhorn Project—located within BMU 13—which is adjacent to BMU 12. FS2361. The Forest Service further recognized that BMU 12 is "largely under federal land management," but "activities on private property have impacted bear habitat by increasing road density, increasing human population and density, and reducing core area. FS2361. The Forest Service acknowledged that these activities on private property affect federal land management. FS2361. Ultimately, the Forest Service determined that "[t]here are no other reasonably foreseeable federal, state, or private activities planned that would contribute to the magnitude or scope of effects described above." FS2362.

In the Project EA, the Forest Service discloses past, present, and reasonably foreseeable actions within or adjacent to the Project Area. FS1053–54. The Forest Service disclose that the Buckhorn Project, OLY Project, and Starry Goat Project will have prescribed burning. FS1054. The Forest Service further discloses that the "Buckhorn project will have planting and precommercial thinning," and that "[t]here is about 600 acres of harvest occurring in the OLY timber sale on land adjacent to the Project Area." FS1054.

The analyses in the Wildlife Report combined with the disclosures made in the Project EA sufficiently analyze the cumulative impacts of the Project. As highlighted in *Seven Countys*, the Forest Service has "broad latitude" in determining where to draw a "manageable line." 145 S. Ct. at 1513. Because here,

38

the decision of where to draw the line "falls within a broad zone of reasonableness," the Court must "afford [the agency] substantial deference." *Id.*

Defendants are entitled to summary judgment as to Claim One, insofar as the agency as sufficiently analyzed the cumulative impacts of the Project.

## V.    Preparation of an EIS (Claim Three)

Both Plaintiffs' First Amended Complaint and SAC include claims that Federal Defendants failed to prepare an EIS in violation of NEPA and the APA. (Docs. 14 at 54–55; 107 at 54–56.) However, Plaintiffs' briefing does not offer any argument in support of these claims. Likewise, Plaintiffs did not provide argument on the issue at the hearing. As such, the Court grants summary judgment in favor of Defendants on Claim Three.

## VI.    Remedy

Plaintiffs request that the Court "either vacate the Project Decision Notice or remand the Project Decision Notice and enjoin Project implementation." (Doc. 30 at 50.) Federal Defendants insist that vacatur is not necessary, and if the Court rules in Plaintiffs' favor, the Court should permit the parties to brief remedy. (Doc. 59 at 49–50.) Because the Court agrees that vacatur is not necessary, the Court declines the request for supplemental briefing and orders that the Project be remanded.

CONCLUSION

Accordingly, IT IS ORDERED that the Parties motions for summary judgment are GRANTED IN PART and DENIED IN PART as follows:

1. Plaintiffs' motion for summary judgment (Doc. 29) is GRANTED as to: Claim One insofar as it Defendants violated NEPA by not taking a hard look at the effects of unauthorized road use to Grizzly Bears; Claim Two insofar as Defendants violated NFMA, NEPA, and the APA by not complying with the Access Amendments and the Kootenai Forest Plan; Claim Four; and Claim Five insofar as Defendants violated the ESA by failing to account for unauthorized road use in density and core calculations.

2. Federal Defendants' and Defendant-Intervenor's are entitled to summary judgment on all other Claims.

IT IS FURTHER ORDERED that this matter is remanded to the agencies for further review consistent with this Order.

DATED this 27th day of October, 2025.

_Dana L. Christensen_
Dana L. Christensen, District Judge
United States District Court